FLAGG and others *v.* MANHATTAN RY. Co. and others.*

*(Circuit Court, S. D. New York. December 21, 1881.)*

1. CORPORATIONS—GUARANTY OF DIVIDEND—POWER OF DIRECTORS.

An agreement between two corporations, whereby one guaranties the other a certain specified annual dividend on its capital stock, is not a guaranty to its stockholders severally, but to the corporation, and the power to modify the terms of such guaranty is in the directors of such corporations, not in the stockholders. Where such power is fairly exercised by the directors, in view of all the circumstances, and in good faith, a court will not interfere, even though, on the same facts, it might have arrived at a different conclusion.

In Equity.

*S. P. Nash,* for plaintiffs.

*D. D. Field,* for defendants.

BLATCHFORD, C. J. This suit is brought by three persons as individuals and two persons as copartners, who claim to be owners of shares of the capital stock of the Metropolitan Elevated Railway Company, 155, 10, 150, and 75 in number, of the par value of $100 each, there being 65,000 shares in all. The three companies defendants are railroad corporations organized under the laws of the state of New York, and will be called the Manhattan, the Metropolitan, and the New York. The first company had no lines of railway. The second and third companies had elevated railways in the city of New York. On the twentieth of May, 1879, the three companies entered into a written agreement known as the "triparte" agreement. It recites that the agreement is made "for the purpose of avoiding the danger of crossing elevated railway tracks upon the same level, and otherwise securing to the people of New York the advantages of safer and more rapid transit through the action of one directing body." It provides for the execution of the leases hereinafter mentioned, and contains other provisions which it is not important at this point to notice. On the same day the Metropolitan and the Manhattan executed an agreement of lease in writing. It recites that the Metropolitan is authorized to construct and operate a line of elevated railway in the city of New York, a portion of which, specifying it, is completed and in operation by it, and is engaged in constructing other parts; that the New York is the owner of and engaged in operating certain lines of elevated railway in said city over routes heretofore established by law for it, "which railways and routes at various places unite with the railways and routes" of the Metropolitan, "and

*Reported by S. Nelson White, Esq., of the New York bar.

cross and connect and unite therewith at the same level;" that "the development of the business of passenger traffic on elevated railways in said city has made it necessary for each of said companies to run trains in such manner and with such speed and frequency that the crossing of the trains of one company over and upon the tracks of the other company, and the running of the trains of both companies upon the portions of the track and route jointly owned or used by them, is deemed impracticable except at the risk of inconvenience and delay to the public and danger to human life;" that, "after protracted efforts to devise plans for operating all said lines so as to afford to the public perfect fullness of accommodation and safety, it is the opinion of both companies that such management cannot be assured while the trains of the two companies are run under the control of differing managing officers, or otherwise than by placing the lines of both companies under one sole control, with power to change from time to time the *termini* of routes, to regulate and limit the passage of trains from the tracks of one company upon the tracks of the other at the connecting and crossing points, and to do such other things and make such other changes, from time to time, in the entire management of traffic upon the lines of both railways, as experience may show to be necessary or desirable;" that the Manhattan "is by law authorized to construct and operate elevated railroads in the city of New York, whether owned or leased by it, and is willing and desirous to accept," and the Metropolitan and the New York "have agreed to execute and deliver to it leases of all their respective railways and properties as described in this instrument, and in a similar instrument of even date herewith to be executed by the New York," "as lessor to the Manhattan," "upon all and singular the terms, agreements, and conditions herein and therein mentioned and set forth;" that the Metropolitan "has heretofore executed to the Central Trust Company of New York its first mortgage, bearing date July 10, 1878," "securing the bonds therein provided for, the total amount thereof now issued and agreed to be issued being $8,500,000 of principal; that the Metropolitan "may be hereafter required" by the Manhattan "to issue further amounts of the said bonds secured by the said mortgage in excess of said $8,500,000," for the purpose of constructing and equipping extensions of the line of the Metropolitan, "payment of all which bonds, principal and interest, is to be assumed by the Manhattan;" and that the Metropolitan "has issued and agreed to issue its capital stock to the amount, at its par value," of $6,500,000, upon which stock the Manhattan "has agreed to guar-

anty the payment of a dividend of 10 per cent. per annum as hereinafter provided."

Then, by the agreement, the Metropolitan, "in consideration of the rents, covenants, and agreements hereinafter mentioned, reserved, and contained, on the part of the Manhattan," "to be paid, kept, and performed," leases to the Manhattan "all and singular the railroad, or railway, now owned, operated, or constructed by it in the city of New York, as above described, and all and singular the unfinished portions thereof now under construction, together with all its franchises, rights, and privileges relating thereto, or to the construction and operation of its entire railway as authorized, subject to the said mortgage, and to the terms and conditions under which said franchises are held by the company, with all and singular the right, title, estate, and interest which the Metropolitan Company has in any real estate in the city of New York heretofore acquired by it, or which it may hereafter acquire under contracts already made therefor, being all and singular the entire property and estate of said Metropolitan Company, except such of its franchises, rights, and privileges as are or may be necessary to preserve its corporate existence or organization, and its interest in the covenants and conditions of this indenture." The lease is for 999 years from November 1, 1875, or so long as the Manhattan "shall continue to exist as a corporation, and be capable of exercising all the functions herein stipulated on its behalf;" the Manhattan paying to the Metropolitan the yearly rent of $10,000, payable semi-annually on the first days of January and July, the first payment of $5,000 to be made July 1, 1879, "and keeping and performing all and singular the covenants and agreements hereinafter set forth to be by the Manhattan" "kept and performed." The Manhattan assumes and agrees to pay, as they respectively become due, the principal and interest of the said recited first-mortgage bonds of the Metropolitan, and keep it harmless from all claims against it arising from all or any of said bonds. Then follows this article:

"Art. 2. The Manhattan Company guaranties to the Metropolitan Company an annual dividend of 10 per cent. on the capital stock of the Metropolitan Company, to the amount of $6,500,000; that is to say, the Manhattan Company will, each and every year during the term hereby granted, beginning with the first day of October, 1879, pay to the Metropolitan Company $650,000, free of all taxes, in equal quarterly payments of $162,500 each, on the first days of January, April, July, and October, in each year, the first of such payments to be made on the first day of January, 1880, and the Manhattan Company will, from time to time, execute

in proper form a guaranty to the above effect, printed or engraved upon the certificates of stock of the Metropolitan Company, and, as such stock certificates are surrendered for cancellation and reissue, will, from time to time, at the request of the holder, renew such guaranty upon all reissued certificates."

It is then provided that the portions of the railway of the Metropolitan which were completed on the thirty-first of January, 1879, shall be deemed to have been operated from the close of business hours on that day by the Manhattan, and all such operation from and after that time shall be for the account of the Manhattan; that the Manhattan shall run the railways, and keep them in repair and working order, and supplied with rolling stock and equipment; that, "in addition to the rental hereinabove provided," it shall pay all taxes, assessments, duties, imposts, dues, and charges which shall become payable by the Metropolitan, or be imposed on the leased property, or its business, earnings, or income; that the Manhattan will save harmless the Metropolitan against all expenses of operating the railways, and all claims and suits for injuries to persons and property, or for causing the death of any person, or for any other thing in the operation or management of the leased property, or for any breach of contract by the Manhattan in carrying on the business, and will defend all suits and claims brought against the Metropolitan in respect of any matter arising out of the management or operation of said railways since January 31, 1879, and that, in case the Manhattan shall at any time fail to pay in full said cash rental, "or the guarantied dividend aforesaid, as the same shall become payable, or fail or omit to keep and perform the covenants and agreements herein contained, or any of them, and continue in default in respect to the performance of such covenant or agreement, or payments, for the period of 90 days," the Metropolitan may enter on the leased railways and premises, and thenceforth hold, possess, and enjoy them as of its former estate, and, upon such entry, the interest of the Manhattan therein shall cease. The Manhattan then agrees with the Metropolitan that it will execute, acknowledge, and deliver "any and all instruments for the more effectually assuring unto the Metropolitan" "the payment of the cash rental and dividends hereinbefore reserved or agreed to be paid." On the same twentieth of May, 1879, an agreement of lease, in writing, was executed by the Manhattan and the New York, in like terms, in all respects, *mutatis mutandis*, with the one between the Manhattan and the Metropolitan.

Under these agreements of lease the Manhattan proceeded to operate the railways of the other two companies. On the second of July,

1881, the people of the state of New York brought a suit in the supreme court of New York, against the Manhattan, the complaint in which sets forth the fact of said leases, and the operation of the roads under them by the Manhattan; that by their terms it agreed to pay outstanding obligations of the other two companies amounting to very large sums, and, under them, is now liable for the payment of bonds of said companies, amounting in the aggregate to about $21,000,000, and the interest thereupon, and for the payment of all taxes on said roads, and to pay to said companies certain additional fixed charges created by said leases, and which aggregate more than $1,300,000 per annum; that the Manhattan is, and for a long time has been, operating said railroads at a great loss, which loss for the year ending September 30, 1880, was, according to the estimates, about $500,000; that the continued operation of said road by it will result in further loss to it; that it owes, and for a long time past has owed, a sum exceeding $900,000 for taxes unpaid, a large part of which has been due for more than one year; that it has no assets with which to meet its existing indebtedness, and the requirements of said leases, except the receipts which accrue to it, from time to time, from said roads, which fall short of its annually-accruing obligations to the amount of at least $1,000,000 per annum; and that, on or about April 25, 1881, it addressed a communication in writing to the mayor, comptroller, and corporation counsel of the city of New York, whereby it declared itself to be unable to defray its obligations, especially its indebtedness for taxes, and in substance declared itself insolvent and showed it had been so for more than a year. The complaint prayed a dissolution of the incorporation of the Manhattan, and a forfeiture of its corporate rights, privileges, and franchises, and the appointment of a receiver of its property, and of a temporary receiver. On the twelfth of July, 1881, the Manhattan answered the complaint, denying its insolvency, admitting that during the year ending September 30, 1880, the said roads were operated by it at a loss, and that, on or about the twenty-fifth of April, 1881, it addressed a communication in writing to the mayor, comptroller, and corporation counsel of the city of New York, and denying the other material allegations of the complaint. On the thirteenth of July, 1881, the supreme court, by Mr. Justice Westbrook, after a hearing of both parties, appointed John F. Dillon and Amos L. Hopkins to be temporary receivers of the Manhattan. On the twenty-third of July, 1881, the New York presented to the supreme court a petition

in said suit, praying that the Manhattan and the receivers be directed to deliver over to the New York its railways and other property. The petition alleges that the Manhattan owes the New York for gross rental, dividend rental, and interest on mortgage bonds $465,000 and has not paid the taxes assessed on the New York for 1879 and 1880; that the New York owes no debts except its first-mortgage bonds to the amount of $8,500,000, and claims for damages and taxes which the Manhattan is bound to pay, and has a considerable cash surplus on hand; that the Metropolitan owes first-mortgage bonds to the amount of $10,818,000, and second-mortgage bonds to the amount of $2,000,000; that the net earnings of the railways of the New York for the last two years have been more than enough to pay the interest on its bonds and dividends of at least 10 per cent. to its shareholders, but the net earnings of the railways of the Metropolitan have been barely enough to pay the interest on its bonds; that the dividend rental paid to the Metropolitan for the six months prior to July, 1881, has been paid out of the earnings of the New York; that the indebtedness of the Manhattan to the New York is increasing every day, and the railways of the New York and the Metropolitan are now run at the expense and risk of the New York; that the structures and rolling stock of the New York and the Metropolitan have not been kept up to the standard required by the tripartite agreement and the leases, and the falling off in this respect has been greater on the New York railways than on the Metropolitan; that the Manhattan has kept up the structures and rolling stock of the Metropolitan better than it has kept up those of the New York; that a considerable number of the engines of the New York have been sold by the Manhattan, which has neither replaced the same nor paid the proceeds to the New York; and that the New York, if it got back its railways in their present condition, would have to pay a large sum to replace its rolling stock and structures in the state in which the Manhattan took them. This petition was brought to a hearing before Mr. Justice Westbrook on the fourteenth of September. No decision on it being made, the New York, on the thirtieth of September, presented a supplemental petition, praying the same relief, and setting forth that since the default of the Manhattan in not paying to the New York the various sums of money which were due on July 22d, 90 days have elapsed, the last day of the 90 being September 29th; that none of said moneys have been paid except $50,000, paid before the former petition was brought; that on the twenty-ninth of September the New York demanded of the Manhattan and of its receiv-

ers payment of said sums, but they were not paid; that by reason thereof a forfeiture of said leasehold estate has accrued to the New York, and that it is entitled to the possession thereof. This supplemental petition was brought before the court on the third of October, and, after hearing the plaintiffs in the suit and the receivers, and the New York, the Metropolitan, and the Manhattan, an order was made giving leave to the Manhattan and the Metropolitan to answer on or before October 5th, and directing that the supplemental petition be considered as part of the original petition.

On the eighth of October, 1881, the receivers put in an answer to the petition of the New York, and the Manhattan put in an answer to it similar to the answer of the receivers. The answer sets up that on or about August 31, 1881, one Watson brought a suit in this court, by leave of the said supreme court, in behalf of himself and all other stockholders of the Manhattan, against the New York and the Metropolitan and the receivers, by filing a bill of complaint and serving process on the defendants, the same being what is known as a stockholders' suit, and, in substance and effect, a suit by the Manhattan against the New York and the Metropolitan to have judicially determined whether the New York and also the Metropolitan are not indebted to the Manhattan each in the sum of $6,500,000, the bill alleging an indebtedness of the New York to the Manhattan of $6,500,000 and seeking to enforce such liability, and praying an accounting of the operations of the lease from the New York, and that the New York be decreed to pay to the Manhattan or to the receivers such sum as may be found due; that the legal rights and equities of the New York and the Manhattan are necessarily involved in said suit, and the supreme court ought to leave the rights of the parties to be determined therein on issues regularly made and tried on proof; that the supreme court should not, as a court of equity, enforce the forfeiture asked, but leave the New York, by ejectment or other remedy at law, to recover possession of the property; that there are $13,000,000 of Manhattan stock outstanding in the hands of numerous and scattered holders; that the effect of granting an order of forfeiture will be to destroy the value of such stock beyond repair; that on the last day of September an injunction order was in force, granted by Mr. Justice Westbrook, in said suit, restraining the Manhattan and its officers from interfering in any way in the business of the Manhattan; that the three companies are, and were on the thirtieth of September, by an injunction issued in a suit in this court, each of them enjoined from paying any taxes imposed on the capital

stock and personal property of any one of them by the city of New York for the year 1880; that the New York, in a suit brought by it in July, 1881, against the Manhattan and the Metropolitan, obtained an injunction order restraining the Manhattan from parting with any moneys then in the possession or under the control of the Manhattan, which had been or might be received by it from traffic on any of the railways of the New York, except as required strictly for the operation of the railways of the New York leased to the Manhattan, which injunction was in force on the last day of September; that the Manhattan is not in default for not paying taxes assessed on the New York for the years 1879 and 1880; that as to the remainder of the taxes assessed on the New York, the Manhattan, because the taxes were excessive, unequal, and illegal, determined, with the concurrent consent of the New York and the Metropolitan, that payment of them should be refused and proceedings be taken to review such unlawful taxation, and such proceedings were taken and are pending in the name and at the request of the New York to contest the legality of said taxes and the obligation of the Manhattan to pay them; that the alleged default of the Manhattan in not paying the taxes assessed upon the New York in the years 1879 and 1880 was in accordance with the express instructions of the New York to that effect, and the action of the Manhattan in relation thereto was essential to the protection of the rights of the companies parties to the triparite agreement, and of the stockholders of each of said companies; and that on or about the first of October, 1881, the New York and the Metropolitan demanded of the receivers the payment of rent alleged to be due to them respectively from the Manhattan under said leases.

Mr. Justice Westbrook rendered a decision on the petition of the New York, at a date stated in the bill in this suit to have been on or about the fourteenth of October, 1881. The decision refers to the fact that in the tripartite agreement the Manhattan agrees to issue and deliver to the New York and the Metropolitan its two bonds, each for $6,500,-000, payable on demand,—one to a trustee for the stockholders of the New York, and the other to a trustee for the stockholders of the Metropolitan, with authority to the trustees respectively to use the same, if they see fit, in payment for the stock of the Manhattan at par; and that the said bonds were executed and exchanged for stock in the Manhattan, so that the New York and the Metropolitan, or their stockholders, became the owners of the entire capital stock of the Manhattan, then amounting to $13,000,000. Mr. Justice Westbrook held that the mere appointment of the receivers did not terminate the

lease, nor did the insolvency of the Manhattan, if it were insolvent; that the court had no power to settle the questions involved summarily, or otherwise than in an action regularly instituted by the New York to recover the property; that the failure to pay the taxes did not forfeit the lease, because the New York had approved the non-payment, and because there was a proper question as to the lawfulness of the taxes not paid; and that the testimony as to a breach of the lease by not keeping the road of the York in repair was conflicting. As to the default for 90 days in paying the rent, the judge remarked that the New York had obtained the said injunction against the Manhattan, and could not enforce a forfeiture arising from the non-payment of money, when it had itself enjoined the Manhattan from using the principal part of its revenue for any such purpose. The judge then proceeds to say:

" Waiving, however, this point, there is another of great importance also made by said answers of the Manhattan Company and the receivers, which will now be stated. It will be remembered that the capital stock of the Manhattan Company is $13,000,000. This entire stock was transferred and given to the New York Company and the Metropolitan Company in professed payment of the leases made to the Manhattan Company—$6,500,000 to each. It is true, this was not directly done, for the form was the execution of two bonds by the Manhattan Company of $6,500,000 each,—the one to a trustee for the benefit of the New York Company, and the other to a trustee for the benefit of the Metropolitan,—which bonds were exchangeable for the stock of the Manhattan Company at par, and such exchange was immediately made. The directors of the Manhattan Company were persons who were directors of the other two companies. By the terms of the lease the Manhattan Company was to pay the bonded debt of the other companies, with the interest, and also an annual dividend of 10 per cent. on the capital stock of the lessor companies, in quarter-yearly payments. The plain effect of this transaction is manifest. The lessor companies being the owners of the stock of the lessee company, and their directors being its directors, the individuals owning the stock of the former really agreed with themselves to pay themselves a large and liberal rental for the use by themselves of their own property. This was the real transaction, but, as individuals were concealed under the cloak of corporations, the apparent transaction, which alone the general public would be apt to see, was a leasing from two independent corporate bodies to a third equally independent. Such leasing, however, was at a rental which, if the estimates of the earning capacity of the leased roads, submitted upon this motion by the petitioner to prove the bankruptcy of the tenant company, are accurate, it was impossible for such company to pay. The individuals who had thus extracted the life from the lessee company by the provision for the payment to themselves of liberal dividends and the absorption of its entire stock, proceeded to divide and did divide such stock among themselves, and then disposed of it to the general public, thus shifting the burden of paying rent from

themselves to others, and actually receiving from such strangers to the original transaction large sums for the privilege of assuming burdens they could not discharge, and which could only result in the restoration to them of the property leased, and the absolute loss by the buyers of Manhattan stock of their whole purchase price. To recover payment for this stock from the two lessor companies an action is now pending in the United States circuit court for the southern district of New York, brought by John C. Watson, a stockholder of the Manhattan Company, to which suit, by permission of this court, the receivers appointed in this action are parties. The existence of this action, and the grave questions which it presents, are urged both by the Manhattan Company and the receivers as reasons why, in advance of the determination thereof, this court should not surrender the property it holds by its receivers. It would, perhaps, be improper to express an opinion upon the merits of this action further than to say that it presents reasonable grounds for judicial inquiry. As a rule, stock purchased of a corporation must be paid for either in cash or its equivalent, and, if not so paid for, the money which it represents can be recovered. The answer of the petitioning company is, of course, that the stock was paid for by the lease which it gave. Whether, however, this was a *bona fide* exchange of a substantial thing which the law can treat and regard as a payment for the stock transferred, or the contrary, is the point which that suit presents. Leaving out of view the very grave questions of the power of the lessor companies to lease its roads, and of the lessor company to accept them,—which is not considered, because not presented nor argued, but which leases, if illegal, because *ultra vires*, would leave the stock of the Manhattan Company entirely unpaid for,—is it not most apparent that the innocent holders and purchasers of the stock of the Manhattan Company have grave questions to submit to the courts, both as against the lessor companies and also their stockholders, who placed the Manhattan stock upon the market to their great injury? It is enough for present purposes, without passing directly upon the merits of the Watson suit, to say that that which is unjust is unlawful, and for every unlawful act done to another to his injury the law affords a remedy. Whether any of the apparently bald facts which have been mentioned can be explained so as to give them a different color, is a question for the trial. As they appear upon this motion to me, it is plain that they should not be ignored, and the property asked for surrendered upon the ground of the non-payment of obligations incurred by the lease, when, perhaps, a trial of the action pending may determine that the Manhattan Company is not a debtor to, but a creditor of, the petitioner."

After thus reaching a conclusion on the merits' adverse to the relief sought, the judge held that, as the application was one addressed to the discretion of the court, and as it involved grave and difficult questions of law and fact, it ought to be disposed of by an action, and not by a motion. He added:

"To the general objection of deciding such grave questions as this application involves so summarily is added one growing out of the tripartite agreement hereinbefore detailed. A sort of *quasi* partnership was thereby formed

between the three contracting parties. The Metropolitan Company joins its objections to those of the Manhattan Company, and protests against the granting of the petition, and claims the right to be heard by a formal suit upon the issues which have been presented. Their request is reasonable, and the relief asked for must be denied upon the ground of discretion, also, without prejudice, however, to the right of petitioner to bring an action against the receivers, leave to do which will be granted."

The portions of the tripartite agreement thus referred to as forming a sort of *quasi* partnership are a provision providing for building certain parts of the railway structures at the joint expense of the New York and the Metropolitan, and a provision (article 14) that whenever, in any fiscal year, the Manhattan shall elect to declare a dividend of more than 10 per cent. on its capital stock, the Manhattan shall pay to the New York and the Metropolitan a sum sufficient to enable them to pay as large a dividend in excess of 10 per cent. on the stock of the New York and the Metropolitan as shall be declared on the stock of the Manhattan, in connection with the other provisions of that agreement.

Such was the condition of the litigation between or affecting the three companies, so far as it is material to refer to it, when, on the twenty-second of October, 1881, the agreement in writing was made between them, out of which the present suit arises. It sets forth, as part of it, copies of the tripartite agreement and of the two leases. It then recites that possession of the railways and property leased was delivered to the Manhattan, and it continued in the possession and operation thereof until July 14, 1881, when possession thereof was delivered to said receivers, who are still in possession thereof, operating them; that "it has been found impracticable to carry out the various terms and conditions imposed by said agreement and leases on the Manhattan;" that the interests of each of the parties, as well as the interest of the public, still require that the lines of railway shall continue to be operated under a single management, and that the parties, "for the purpose of settling all the matters and differences between them, and for continuing the operation of said properties and railways by a single management," have agreed to modify the said agreement and leases as hereinafter set forth. It then provides as follows:

*First.* The Manhattan shall continue to possess and operate the properties and railways for the period and on the terms agreed in the leases, except as "herein" modified or changed, such possession to commence as soon as the properties can be obtained from the receivers.

*Second.* The Manhattan, from moneys received by it on acquiring posses-

sion of the properties, and all moneys thereafter acquired by it from the operation of them, after the payment of operating expenses, and of all lawful taxes and assessments against either of the parties or its property, and before paying the sums mentioned in clause 3, shall pay: (1) To the New York all sums of money due and owing to it, under the terms of the lease from it, on the first of July, 1881. (2) To the Metropolitan in the same manner, and out of said moneys, the interest due on its bonds, as provided in the lease from it, from the first of January, 1881.

*Third.* After making the payments provided for by clause 2, all moneys received by the Manhattan from the operation of the properties shall be used by the Manhattan: (1) For the payment of operating expenses and maintenance of structures and equipment. (2) For the payment of all taxes and assessments lawfully imposed upon either of the parties, or its properties, or the income therefrom. (3) For the payment of the interest on the bonds of the New York and Metropolitan. (4) For the payment to each of them of the rental of $10,000 per annum, as set forth in the leases. (5) The Manhattan shall pay to the New York annually, during the continuance of the leases, a sum of money equal to 6 per cent. per annum on the amount of the present capital stock, to-wit, $6,500,000 of the New York, in equal quarterly payments of $97,500, on the first days of January, April, July, and October; the first to be made January 1, 1882. (6) The Manhattan shall pay to the Metropolitan annually, during the continuance of the leases, a sum of money equal to 6 per cent. per annum on the amount of the capital stock of the Metropolitan, in equal quarter-yearly payments, on the first days of January, April, July, and October; the first to be made January 1, 1882. (7) The several payments enumerated in the foregoing six subdivisions of clause 3 shall be made, and shall have preference over one another, in the order so enumerated, and all moneys received by the Manhattan from the operation of the properties, after making said payments, shall be the property of the Manhattan, and shall be retained by it for its own use and benefit, subject to the covenants "herein" contained, and to unmodified covenants of the leases. (8) The sums provided to be paid by subdivisions 5 and 6 of clause 3 shall only be payable out of the moneys received by the Manhattan from the operation of the properties prior to the dates respectively at which said payments by the terms of the agreement become due.

*Fourth.* The provisions of the tripartite agreement and the leases are modified so as to conform to "the provisions of this agreement," and the New York and the Metropolitan release the Manhattan from all agreements to pay to the New York and the Metropolitan, or either of them, "the sum or sums of money as is particularly provided in" article 14 of the tripartite agreement and article 2 of the leases.

There is also a clause whereby each of the parties releases the others, and each of them, "of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, claims, and demands whatever, whether in law or in equity, against either of the other parties hereto, except such as are em-

braced in and created by the terms of said agreement and leases, as modified, and the terms and provisions of this agreement." By a supplemental agreement of the same date, executed by the three parties, it was further agreed that the Manhattan will pay to the New York all sums due and owing to it under its lease to the Manhattan, up to and including October 1, 1881, and that the Manhattan will pay the New York the sum of 6 per cent. on its present capital stock "in the manner and at the times stated in the foregoing agreement, and the payment thereof shall be cumulative, notwithstanding any provision in the eighth subdivision of the third clause thereof."

The bill in this suit is brought by the plaintiffs in their own behalf, and in behalf of all others, shareholders in the Metropolitan, similarly situated with the plaintiff, who may come in and contribute to the expenses of the action, and consent to be bound by the decree herein. It alleges that immediately after the execution of the tripartite agreement and the leases, and the delivery of its road to the Manhattan, the Metropolitan, in order to secure to its shareholders the benefit of article 2 of the lease, and in order to enhance the value of the shares of said stock, caused to be printed on the stock certificates of the Metropolitan the following memorandum: "The Manhattan Railway Company, for value received, has agreed to pay to the Metropolitan Elevated Railway Company an amount equal to 10 per cent. per annum on the capital stock of the latter company,—that is to say, on $6,500,000, payable quarterly, commencing January 1, 1880;" that the capital stock of the Metropolitan then was, and still is, $6,500,-000, divided into 65,000 shares of the par value of $100 each; that all the certificates of said shares issued by the company after the execution and delivery of the tripartite agreement and leases were issued with said memorandum printed thereon; that the said shares were largely dealt in in the city of New York, and were bought and sold as stock, upon which an annual dividend of 10 per cent. was guarantied by the Manhattan, and as, upon the sale and transfer, from time to time, of shares of said stock, certificates were surrendered for cancellation and reissue, the Metropolitan issued new certificates containing the same memorandum, and no shares were dealt in after January, 1880, which did not contain said memorandum; that during the year 1880 the Manhattan paid to the Metropolitan quarterly, and the holders of shares of the Metropolitan received, the said dividends so "guarantied," and said dividends were also paid in January and April, 1881, but thereafter the Manhattan made default in the payment of the dividend due July 1, 1881, and has hitherto continued

in default; and that each of the plaintiffs purchased his stock as stock upon which a dividend of 10 per cent. was guarantied by the Manhattan, and with knowledge of the general provisions of the tripartite agreement and the leases, and the certificates issued to the plaintiffs by the Metropolitan having each of them on it the said memorandum.

The bill recites the appointment of the receivers, and alleges that on or about the twenty-fifth of October, 1881, by order of the court, the property was surrendered by the receiver to the Manhattan, and the receivership was vacated. It sets forth the fact of the application of the New York for the restoration of its property and of its denial, and the making of the agreement of October 22d. It alleges that the suit brought on behalf of the people was not ended until about November 17th; that there has been no material change in the alleged insolvent condition of the Manhattan which made the receivership proper, other than such as may result from the execution of the agreement of October 22d; that, during the receivership, negotiations were entered upon between some of the officers of the three companies looking to a modification of the terms of the tripartite agreement and the leases; and that, during the pendency of said negotiations, it was given out, and the plaintiffs expected that the terms of any arrangement which should be concurred in by the officers negotiating on behalf of the several companies would be submitted to the shareholders for approval, but the plaintiffs have never been consulted in respect to said proposed agreement, and have never consented thereto, and have only been able to ascertain the terms of the same with considerable difficulty.

The bill further alleges that, by the agreement of October 22d, the officers of the Metropolitan have undertaken to subordinate the rights and the position of the Metropolitan to the New York, especially by releasing all claims to the dividends accruing July 1st and October 1st, amounting to $325,000, whereas the same amount due to the New York is to be paid, and, in reference to future dividends, by waiving altogether the guaranty of the Manhattan, and making the dividends payable to the Metropolitan payable only after the dividends to the New York shall have been first paid, and out of any surplus earnings that may be left; that, in the supplemental agreement of the same date, the rights and position of the Metropolitan were further subordinated to the New York, in that the dividends agreed to be paid to the New York were to be cumulative, while those due to the Metroplitan could never be paid out of any earnings, however

large, received after the date of the accruing of the dividend; that the officers of the Metropolitan, who have actively labored to consummate said arrangement, have betrayed its true interests, and the rights and interests of its shareholders, influenced thereto by corrupt motives, and by personal interest hostile to their position and duties as its directors; that at an election of directors held in July, 1881, Russell Sage and Jay Gould became for the first time directors of the Metropolitan; that the Manhattan being shortly thereafter, and on or about July 13th, placed in the hands of receivers, its shares became very much depressed in value, and in August following sold as low as $16 per share; that thereupon said Gould, being a director of the Metropolitan, began purchasing shares in the Manhattan, and on October 8th had standing in his own name, on the books of the Manhattan, 20,000 shares; that 1,000 shares then stood in the name of the son, George J. Gould, 1,100 shares in the name of W. E. Connor, and 12,400 shares in the name of W. E. Connor & Co., who have heretofore acted as the brokers of said Gould in the purchase and sale of stock, and in which firm said Gould is a partner; that said 14,500 shares belong to or are held in the interest of said Gould; that when said agreement was made he had invested in the stock of the Manhattan over $500,000; that said Sage, a director and the president of the Metropolitan, is largely interested in the stock of the Manhattan, though his name appears on its stock register as the holder of only 100 shares; that said Gould is in his own name the largest holder of stock in the Manhattan, substantially all of which he has acquired since he became a director of the Metropolitan; that he, together with said Sage, took an active and the principal part in the negotiations which led to the agreement of October 22d; that the negotiations on the part of the New York were conducted by its president, Cyrus W. Field; that though he holds, as appears by the stock register of the Manhattan, only 100 shares of its stock, he has become largely interested in the Manhattan, and began to purchase shares of it as soon as it seemed probable said agreement would be executed and in view of its being carried into effect; that said Sage, who, as president of the Metropolitan, executed said agreements of October 22d, and said Gould, who actively influenced their execution, were, from their fiduciary position, disqualified from executing the same without the consent of the shareholders of the company they represented, and that the same were executed corruptly, for the personal ends of the signers of the same.

The bill further alleges that the Metropolitan, on or about November 1, 1879, executed a mortgage on their line and property, second and subordinate to the mortgage referred to in the tripatite agreement, for the purpose of raising funds to complete and improve the unfinished lines, as provided in said agreement, such second mortgage being made to secure $4,600,000 of bonds; that only $2,000,000 thereof had been issued and negotiated at the time of said receivership; that now the Metropolitan has proposed to issue the residue of the bonds provided for in said second mortgage, and to deliver them for negotiation to the Manhattan, and allow it to receive and use the proceeds of the bonds. It also alleges that the Metropolitan, being now in the control of the directors who concurred in the execution of the modified agreement, is shaping its action so as to compel dissentient shareholders to acquiesce in the terms of said agreement, it having stamped as cancelled the guaranty printed on its stock certificates, and, upon a transfer of any certificate containing the guaranty, refusing to issue to the transferee a similar certificate, or any other than a certificate with the guaranty cancelled; that, in aid of this scheme, they, immediately after the execution of said agreement, closed the transfer books of the company; and that the acts and doings of the company, under the management of its present directors, are in hostility to the true interests of the shareholders, and planned in order, through the operation of the market and the customs of the stock exchange, to deprive dissentient shareholders of their just and equitable rights.

The prayer of the bill is:

(1) For a decree that the two agreements dated October 22d are null and void and inoperative as against the plaintiffs; (2) that the Manhattan be perpetually enjoined from performing the same, so far as they change or undertake to change the terms of the tripartite agreement and the leases; (3) that the Metropolitan be enjoined, until the further order of the court, from delivering any of its money or property to the Manhattan, or from issuing to it any of its mortgage bonds for negotiation, or from allowing it to receive the proceeds of any such bonds, or from changing the form of the stock certificates of the Metropoliton, in respect to the matters printed thereon, or doing any other acts which, in respect to the dealings in said shares, or the terms of said certificates, or their registration, shall modify, impair, or embarrass any holders of the certificates having the said memorandum printed thereon; (4) that the Manhattan be enjoined from paying or transferring to the New York any moneys or shares in action under the agreement of October 22d, and from performing any part of the agreement of that date, so far as they change, or undertake to change, the terms of the tripartite agreement and the leases.

The bill is not signed or verified by any of the plaintiffs. It is signed by the plaintiffs' solicitors, and the affidavit of one of them is appended to it to the effect that he has read the bill; that the facts therein stated are true to the best of his knowledge and belief; that the ownership by the plaintiffs of the shares of stock, as alleged, has been stated by them in petitions signed for the purpose of being admitted to the benefit of the suit of Gillett against the same defendants; and that the reason why such verification is not made by the plaintiffs is their absence from the state. Those petitions are not brought before this court.

The two agreements of October 22d are signed by the New York, by said Field, as president; by the Metropolitan, by said Sage, as president; and by the Manhattan, by R. M. Gallaway, as president.

The plaintiffs now move for a preliminary injunction to the purport prayed in the bill. The motion is supported and opposed by affidavits. The facts hereinbefore set forth are free from dispute. The bill is brought by the plaintiffs in their own behalf, and in behalf of all others, shareholders in the Metropolitan, similarily situated with the plaintiffs, who may come in and contribute to the expenses of this suit and consent to be bound by the decree herein. A holder of 50 shares of the stock, bought in February, 1881, makes oath that he bought them with the knowledge of, and in reliance on, the guaranty of the Manhattan, and knowing that he had an interest in the earnings of the Manhattan after the payment of the guaranty to the leased lines and dividends on the Manhattan stock. A holder of 148 shares of the stock, bought in 1880, makes oath that the inducement to him to purchase it was the said guaranty and the positions of equality of the New York and the Metropolitan, and that the action of the directors of the Metropolitan in reducing the dividend on said stock was without his consent, and is a great damage to him, and is illegal and void. These affidavits may be regarded, perhaps, as supplying the defect in the verification of the bill.

1. The principal ground urged in support of the motion is that the agreements of October 22d impair vested rights of the stockholders of the Metropolitan; that each stockholder has for himself such vested rights, and that these rights cannot be impaired as to him without his consent. It is urged that after the Metropolitan lease was executed there was no property left to it upon which anything in the nature of a dividend-paying stock could be based, except the revenue to be derived from the terms of the lease; that the value of the capital stock consisted wholly in such revenue; that the $162,500 to be paid

quarterly to the Metropolitan was the only profit which investors in the stock could hope to realize from their investment; that the stock is stock of a special character, entitled to an agreed portion of a rental to be paid by the Manhattan; that the agreement of the Manhattan is truly expressed in the memorandum on the certificates; that, by the whole transaction, the Metropolitan agrees to distribute such portion of the rental as a dividend among its stockholders; that the Metropolitan, therefore, cannot surrender the guaranty of the Manhattan; that such guaranty must be regarded as a promise to the Metropolitan for the benefit of its stockholders; and that they are entitled to prevent the Metropolitan from diverting the fund or impairing the contract out of which the right to it comes.

It is undoubtedly true that the object of the provisions of the lease in regard to the 10 per cent. per annum on $6,500,000, to be paid by the Manhattan to the Metropolitan, was to enable the stockholders of the Metropolitan to have, if possible, during the continuance of the lease, a quarterly dividend of $2\frac{1}{2}$ per cent. on their stock. But I fail to see any contract to that effect between the Manhattan and the individual stockholders of the Metropolitan, or between such stockholders and the Metropolitan. The language of article 2 of the lease is that the Manhattan guaranties to the Metropolitan an annual dividend of 10 per cent. on the capital stock of the Metropolitan to the amount of $6,500,000; "that is to say," the guaranty is to the Metropolitan, not to its stockholders severally. The article then goes on to interpret the guaranty, and to show what it is, and at what times payments under it are to be made. It says, "that is to say," the Manhattan will, each and every year during the term beginning with October 1, 1879, pay to the Metropolitan $650,000, free of all taxes, in equal quarterly payments of $162,500 each, on the first days of January, April, July, and October in each year, the first to be made January 1, 1880. There is no agreement, either by the Manhattan or the Metropolitan, that these sums shall be paid to the stockholders of the Metropolitan. Then there is the further provision that the Manhattan will, from time to time, execute in proper form a guaranty "to the above effect," printed or engraved on the certificates of stock of the Metropolitan, and, as such stock certificates are surrendered for cancellation and reissue, will, from time to time, at the request of the holder, "renew such guaranty" upon all reissued certificates. This was never done. The Manhattan never executed anything on the certificates. The Metropolitan issued the certificates with an unexecuted memorandum, which does not contain the word "guaranty," and contains

no contract or agreement or guaranty of any kind, but only a statement that the Manhattan has agreed to pay to the Metropolitan an amount equal to 10 per cent. per annum on the capital stock of the Metropolitan; that is to say, on the $6,500,000, payable quarterly, commencing January 1, 1880. This was the interpretation put at the time on the agreement of the Manhattan by the Metropolitan, and accepted by each stockholder of the Metropolitan when he took his certificate. If any stockholder was entitled, on request to the Manhattan, to a guaranty of any kind executed by it on his certificate of stock, he waived his right to it. But, if he had asked for and received it, it would have been "a guaranty to the above effect," being a repetition of the agreement to make the quarterly payments to the Metropolitan; that is, an agreement to do what the memorandum states that the Manhattan had agreed to do. This would not have been any more of a contract between the Manhattan and the stockholder, or between the Metropolitan and the stockholder, than now exists.

2. The case, therefore, is not one of any vested right in the stockholders of the Metropolitan to the 10 per cent. payments, but it depends on the general power of the directors of a corporation to make and modify its contracts. That power is well established in this state. *Hoyt* v. *Thompson's Ex'r,* 19 N. Y. 207, 216. Nor can the stockholders control that power. *McCullough* v. *Moss,* 5 Denio, 566, 575. No statute or authority is referred to which makes it necessary to the validity of the agreements of October 22d that they should have been approved by any one or more stockholders.

3. The leases and the tripartite agreement and the agreements of October 22d were made under the authority of the act of April 23, 1839, (Laws of New York, 1839, c. 218, p. 195,) which provides that "it shall be lawful hereafter for any railroad corporation to contract with any other railroad corporation for the use of their respective roads, and thereafter to use the same in such manner as may be prescribed in such contract." There is nothing to impeach the validity of that statute. The instruments referred to are contracts by the Manhattan and the other two companies for the use by the former of the roads of the latter, on terms satisfactory to each of the latter, as determined by the votes of their boards of directors.

4. It is urged that the question should be considered as if the Metropolitan, on the failure of the Manhattan to fulfil its covenants in the lease, had re-entered, and as if the question were as to a new lease, with terms such as now obtain in the lease as modified. In this

view the new lease is objected.to as *ultra vires*, because it appropriates the revenues of the Metropolitan, as a part of the general funds of the Manhattan, to pay preferred dividends to the New York. The contention is that the Manhattan is to receive all the earnings of the lines of the Metropolitan, and, after paying expenses, taxes, interest, etc., is to pay, first, a dividend of 6 per cent. on the stock of the New York; and that, as the earnings of the Metropolitan are not to be kept separate, no such arrangement can be made without the consent of the stockholders of the Metropolitan. The question is not one of power, but of good faith. If, in good faith, the discretion and judgment of the directors of the Metropolitan were fairly exercised, under the circumstances in which the affairs of the corporation were at the time, in view of all its embarrassments, and of the condition of the Manhattan, and of the litigations existing and threatened, and of the claims made against the Metropolitan and its stockholders by the Manhattan and the stockholders of the Manhattan, and of the relative conditions of the two properties, and of the past and the probable prospective earnings of the roads of the New York and the Metropolitan, no court will undertake to interfere with the exercise of such discretion and judgment, even though, on the same facts, it might have arrived or may arrive at a different conclusion, and even though the stockholders of the Metropolitan might have arrived at a different conclusion. In this view the remarks cited from the decision of Judge Westbrook become of great importance. His views in regard to the claim of the Manhattan for the $13,000,000 were calculated to have great weight, and it is shown they did have great weight in regard to some of the terms of a new arrangement. The Manhattan had made two defaults in paying the dividend rentals, it had been put into the hands of receivers, it was alleged to be insolvent, and it was asserting the claims for $13,000,000. It was perfectly clear that the interests of the public demanded that the two elevated roads should be under one management, and the interests of the public were the interests of the two lessor companies. The state of things was such that the common manager must be the Manhattan. Therefore, its obligations to the other two companies must be modified, because they were too onerous to be fulfilled. The only question was as to the new obligations. The evidence satisfactorily shows that the roads of the Metropolitan were not earning enough net money, over expenses, repairs, and taxes, to pay the interest on its mortgage bonds, and that the New York was earning at least 6 per cent. net, and enough more to make reasonable the preferences given to it over the Metropolitan

in the new arrangement. By that agreement the claims of the Manhattan for the $13,000,000 are released. But, whatever conclusion now a judicial tribunal would come to, on proofs, as to whether the new arrangement was a wise and proper one for the Metropolitan to make, it is sufficient to say that, on the evidence now presented as to what was before the directors of the Metropolitan, and as to their action, they had a right to think, in good faith, that they were doing what was most judicious for their stockholders, and they did what they did in good faith.

5. It is contended that a fictitious necessity was created, and that the stockholders of the Manhattan would have come forward to extricate it from its difficulties. I see no evidence of this. The directors of the Metropolitan had this question before them, necessarily, and passed upon it and acted in view of it.

6. It is alleged in the bill that Messrs. Sage and Gould, while acting as directors of the Metropolitan to make the new arrangement in its behalf, were large holders of the stock of the Manhattan Company, and that Mr. Field was at the time a large shareholder in the Manhattan. The directors of the Metropolitan who voted to approve the agreement of October 22d were Messrs. Sage, Gould, Connor, Sloan, Dillon, Navarro, Stout, Dodge, and Porter. Mr. Garrison was absent. Mr. Kneeland voted in the negative. Leaving out Messrs. Sage, Gould, and Connor, six of the ten present voted in favor of the agreement. As to the supplemental agreement, there were ten directors present, Mr. Sloan being absent. Mr. Stout did not vote. Of the nine voting, Messrs. Sage, Gould, Dillon, Navarro, Connor, Dodge, Porter, and Garrison voted to approve the supplemental agreement, and Mr. Kneeland voted in the negative. Leaving out Messrs. Sage, Gould, and Connor, five of the nine voting voted to approve the supplemental agreement. There were eleven directors in all. Nothing is alleged in impeachment of the positions of Messrs. Sloan, Dillon, Navarro, Garrison, Stout, Dodge, or Porter. Therefore, whatever may be shown as to the positions of Messrs. Gould, Sage, and Connor, the legal aspect of the transaction is not affected.

Mr. Gould was elected a director of the Metropolitan on July 9, 1881. He states that at the time of making the settlement of October 22d he had an interest of 2,500 shares in the Metropolitan, and of 5,000 shares in the New York, his cash investment for the two being $710,354.21, while his actual cash investment in the Manhattan was $599,031.25.

Mr. Sage states that at the time of the agreement of October 22d he held about 1,200 shares of stock in the Metropolitan. He was appointed president of the Metropolitan in July, 1881. He says that at that time he had about 800 shares of the Manhattan stock, but within a few days thereafter "was short" of Manhattan stock, and from that time until after the agreement of October 22d bought no stock of the Manhattan, nor became interested in any, except for the purpose of fulfilling previous contracts; and that his pecuniary interest, if he "had any during the period, was to raise the price of Metropolitan stock and depress the price of Manhattan stock."

Mr. Field states that he sold out all his Manhattan stock, except 13 shares, in November, 1879, and sold those in March, 1880; and that he never bought or became interested again in Manhattan stock until October, 1881, after he "became convinced that a compromise would be made." But he sustained no fiduciary relation to the stockholders of the Metropolitan.

7. The concurrent testimony is that the Manhattan is now entirely solvent; made so, it is true, by the new arrangement, but still solvent. It is out of the hands of the receivers. The tripartite agreement and the leases, except as modified, are in force, and are in force as modified. The mortgage bonds, the issuing of which is sought to be restrained, are to be issued, it appears, under the tripartite agreement and the leases, and pursuant to resolutions passed before the agreement of October 22d, and their proceeds are to be used in perfecting the structure and equipment of the Metropolitan, and in securing the safety of those who travel on the road.

The motion for an injunction is denied.

The bill in the Gillett suit is verified by the plaintiff therein. The motion for an injunction in that suit is denied, and the restraining order is vacated.