# IN THE MATTER OF THE APPLICATION OF LOOK WONG BY LOOK SAY, HIS FATHER, HIS NEXT FRIEND, FOR A WRIT OF HABEAS CORPUS.

## August 30, 1915.

1. *Aliens—Chinese Exclusion Act—Admission of minor son of resident merchant, born of a polygamous marriage*: The minor son of a resident Chinese merchant, the issue of a marriage contracted by the father in China when the father had a lawful wife living in Hawaii, is not entitled to admission to this country, unless on other grounds than that of being the son of such resident, even though the prior marriage was dissolved subsequent to the son's birth.

2. *Conflict of laws—Foreign marriage—Polygamous marriage and issue thereof*: A marriage lawful in China will not be recognized here, so far as to warrant the admission as an immigrant, of the minor son of a Chinese resident merchant, the issue of such marriage, when the marriage was entered into during the existence of a prior lawful marriage contracted in Hawaii between the father and a woman other than the mother of the immigrant—except on another ground than the mere relation of father and son.

*Habeas Corpus:* Hearing on return to writ.

*W. T. Carden* and *C. S. Franklin* (*Thompson, Milverton & Cathcart* with them) for petitioner.

*Jeff McCarn,* U. S. District Attorney, for respondent.

CLEMONS, J. This is a petition for a writ of habeas corpus in behalf of an immigrant, Look Wong, denied a landing at the port of Honolulu, for having "failed to prove a status which entitles him to admission." The order of the immigration inspector denying admission was affirmed on appeal to the Secretary of Labor. In the testimony on which the order was based, the following facts appear:

The immigrant, a minor, male, was born in China August 3, 1898, of Chinese parents. His mother was a resident of China, and was married to his father there in 1891. At the time of the marriage the father who was, had for some time been, and is now, a resident merchant of Hawaii, had here an Hawaiian wife, to whom he had been married for twenty years or more but from whom he was divorced by decree of the Circuit Court of the First Circuit of the Republic of Hawaii, dated February 21, 1898. In 1898 the father returned to Hawaii, after a year's absence in China, and in 1903 again went to China, where he lived with the immigrant's mother until 1913, then returning to Hawaii.

The inspector's decision in full follows:

"It is a maxim that the law favors matrimony. This is based on public policy. The present case presents peculiar conditions, and, in common with others, I have an aversion against doing violence to human feelings. However, a careful consideration of the record in this case leads me to conclude that the applicant, Look Wong, is the natural and not the lawful son of Look Say, whose mercantile status is satisfactorily established. The fact of cohabitation raises a presumption of marriage only in cases where the cohabitation is not meretricious and the subsequent cohabitation with a woman with whom a man had illicit relations would not of itself constitute a common law marriage as it would if the first cohabitation were free from former marital impediment. This matter is comprehensively discussed in the case of *Randlett v. Rice*, 141 Mass. 385. The applicant is a minor.

"Look Wong is hereby denied a landing as a Chinese person who has failed to prove a status which entitles him

to admission to the United States and he is ordered deported to China, the country whence he came."

[1] [2] As to the basis of that decision, two arguments may be possible, (1) for a finding of illegitimacy from want of marriage of the parents, and (2) even if such marriage existed, for a finding of illegitimacy by reason of the existence of a prior marriage. A finding such as the former, being a finding of fact, would be conclusive and preclude review by this court; a finding such as the latter, so far as it is a conclusion of law, would not be conclusive if erroneous. *De Bruler v. Gallo*, 184 Fed. 566, 570. And see Bouve, Exclusion of Aliens, 530-535.

In support of an argument for a finding of no marriage, (1) supra, the presumption in favor of the validity of official acts might be invoked And so it might be supposed that although the testimony tended to prove marriage, the inspector, who was the judge of the credibility of the witnesses, was not convinced—especially as under the regulations of the bureau of immigration governing the admission of Chinese, the inspector should "in every instance" require "exacting evidence of the relationship claimed." Rule 9 (a), (b). Moreover, the language of the decision might be taken to indicate that the inspector did not regard the marriage as established; for it reads: "the fact of cohabitation [i.e., apparently, with the Chinese wife before the divorce of the Hawaiian wife] raises a *presumption* of marriage only in cases where the cohabitation is not meretricious, and the *subsequent* cohabitation [i. e., after the divorce] with a woman with whom a man had *illicit* relations would not of itself constitute a common law marriage as it would if the *first* cohabitation were free from marital impediment."

However, in view of the fact that the decision may not be so definite as to preclude the possibility of the two arguments above stated, as also in view of the fact that, while the only direct evidence of the marriage was the say-so of

the immigrant's father and the bare say-so of the immigrant himself and two others, there were still no inherent inconsistencies in the testimony on this point and no contradiction of it, and in view of the fact that the examining official made no effort to test the witnesses as to the basis of their conclusion of marriage and as to their means of knowledge, etc. (see *In re Jiro Miragusuku,* ante, p. 344), it is more fair to assume that the inspector would not have made a finding of fact so contrary to what evidence there was (weak as it may be) and a finding of fact absolutely determinative of the case, without a definite statement of such finding,—especially as it is not an unreasonable contention that the immigrant was entitled to an express determination of the fact of the alleged marriage upon which his right to enter is based.   See Bouve, Exclusion of Aliens, 517, also Id. 510.   For these reasons, as well as because it is possible to view the decision as a finding of illegitimacy, based on the existence of the father's prior marriage, we shall consider the case in the latter aspect, and then endeavor to determine whether the inspector's decision would be valid as a matter of law.   In other words, admitting the fact of the second marriage, would the child of such marriage be entitled to enter the United States?

It may be said here that in spite of the above suggestion, of the use of the words of the decision last quoted as an argument for a finding of no marriage, the word "cohabitation", as first used in the quotation (in reference to the relation between the father and mother before the dissolution of the prior, Hawaiian, marriage), might imply merely that, because of the existence of the prior marriage, the relation based upon the alleged marriage in China could not be called a valid marriage relation, but only a state of cohabitation.   With that sense of the word "cohabitation" as applied to the marriage in China, the only question is one of law, (2) supra.

It is urged that the marriage, being lawful in China where entered into (as appears from the certificate of the Chinese consul at Honolulu submitted to the Secretary of Labor on the appeal), is lawful here and everywhere, and that the immigrant, born of that marriage and being legitimate there, must be regarded as legitimate here; also, that if the immigrant is legitimate by the law of his domicile, it is immaterial how he came to be so; also, that in applying considerations of policy against polygamy, the court should look no further than the immediate parties, father and mother, and should not look to those one degree removed, who are innocent parties.

Of course, the inspector's decision would be in error in broadly characterizing as illegitimate the issue of such a marriage valid in China. But in the opinion of the court the effect of the decision is esentially sound; for an exception to the rule of recognition of a foreign marriage arises when the marriage contravenes the spirit and policy of our laws and institutions. This polygamous marriage in China is within such exception, and the immigrant here whose status is derived from this marriage must be governed accordingly.

Story says:

"The general principle certainly is that between persons *sui juris,* marriage is to be decided by the law of the place where it is celebrated. If valid there, it is valid everywhere. . . . The most prominent, if not the only known exceptions to the rule, are those marriages involving polygamy and incest; those positively prohibited by the public laws of a country from motives of policy; and those celebrated in foreign countries by subjects, entitling themselves under special circumstances to the benefit of the laws of their own country. . . . In respect to the first exception, that of marriages involving polygamy and incest, Christianity is understood to prohibit polygamy and incest, and therefore no Christian country would recognize polygamy, or incestuous marriages." Conflict of Laws, 7th ed., secs. 113, 113 a, 113 b (and note 3), 114. See also secs. 89, 114 d.

Minor says:

"If one having a consort living and undivorced marries again, though the subsequent marriage should take place in a barbarous state where marriages are valid, it will not be upheld in any civilized country." Conflict of Laws, sec. 75.

Wharton says:

"It is agreed that an act valid when done by a person in his own country is to be regarded as valid in foreign countries, even though in such foreign countries he is treated as incapable of performing such act. . . . At the same time a status held by the *lex fori* to be immoral, or to contravene public policy, will not be enforced although established by a foreign state in conformity with its own jurisprudence." Conflict of Laws, 3d ed., sec. 125. See also Id., secs. 126, 130, 131 a, 175.

Judge Cooley says:

"Polygamous and incestuous marriages celebrated in countries where they are permitted, are nevertheless treated as invalid here, because they are condemned by the common voice of civilized nations, which establishes a common law forbidding them." *Hutchins v. Kimmell,* 31 Mich., 126, 134.

To the same effect are: *Commonwealth v. Graham,* 31 N. E. 706, 707 (Mass.), Field, C. J.; *Ross v. Ross,* 129 Mass. 243, 247, Gray, C. J.; *Commonwealth v. Lane,* 113 Mass. 458, 463, Gray, C. J.; *True v. Ranney,* 21 N. H. 52, 53 Am. Dec. 164, 166; *Pennegar v. State,* 10 S. W. 305, 306-307 (Tenn.); *State v. Ross,* 76 N. C. 242, 22 Am. Rep. 678, 680-681; *Jackson v. Jackson,* 33 Atl. 317, 318-319 (Md.); *Van Voorhis v. Brintnall,* 88 N. Y. 18, 26; *Succession of Gabisso,* 44 So. 438, 441 (La.), and *Campbell v. Crompton,* 10 Fed. 417, 424, Wallace J.; *State v. Tutty,* 41 Fed. 753, 759-760; *United States v. Rodgers,* 109 Fed. 886, 887. See *State v. Ross,* 76 N. C. 242, 22 Am. Rep. 678, 682.

Wharton on Conflict of Laws, 3d ed., sec. 250 a, extends to the offspring of a polygamous marriage the principle above applied by Story and others to such marriage itself:

"As a general principle, the issue of a marriage valid

where celebrated, will be deemed legitimate for the purposes in question, though the marriage would have been invalid and the children therefore illegitimate, tested by the *lex rei sitae* or *lex domicilii decedentis.* The only exceptions to this rule are cases in which the marriage itself, for some reason, comes within an exception to the general rule that a marriage valid where celebrated is valid everywhere."

This rule is applied in *Fenton v. Livingstone,* 5 Jur. N. S. 1183, 3 Macq. H. L. Cas. 497, 556; 3 Wharton, Conflict of Laws, 3d ed., p. 547, n. 4.

The language of Robertson, C. J., in *Sneed v Ewing,* 5 J. J. Marsh. (Ky.) 460, 489, 22 Am. Dec. 41, 68, is pertinent:

"Counsel . . . insist that as Mrs. Ewing was legitimate in Kentucky, she could not have been illegitimate in Indiana or elsewhere. This argument is inconclusive when applied to the facts in this case. As issue is one of the objects and fruits of marriage, and as it is a general rule that the incidents follow the law of marriage itself, the argument would have been more formidable if it had been shown that the marriage in this case had been legal. But, even then, it would not have been conclusive, for although marriage, like other civil contracts, must be regulated by the *lex loci contractus,* it is not every marriage which may be valid by the law of the place where it was consummated, that will be recognized as legal everywhere else. Every sovereign state is the conservator of its own morals, and may nullify incestuous or polygamous contracts."

Any application of the rule of universal recognition of a foreign marriage cannot be tolerated which would give to men who marry in countries where polygamy is lawful, as it is conceded that it was lawful in China, privileges which are denied to our own citizens. Our own citizens do not here gain any privileges, but quite the contrary, *by virtue of a polygamous marriage,* either with respect to their polygamous wives or their children by such wives, and certainly, therefore no subject of a foreign country may come here and *by virtue of a polygamous marriage* valid there

be free to bring with him his polygamous wife and her children, the fruits of such polygamous marriage. This immigrant must come into the country on his own merits and not by virtue of a relation which we recognize as valid in China but disapprove as contrary to our own institutions.

The distinction here is suggested by Lord Justice Turner in *Hope v. Hope,* 8 De Gex, M. & G., 731, 3 Beale's Cases on Conflict of Laws, 468, 471:

"When the courts of one country are called upon to enforce contracts entered into in another country, the question to be considered is not merely whether the contract sought to be enforced is valid according to the laws of the country in which it is entered into, but whether it is consistent with the laws and policy of the country in which it is sought to be enforced."

See *In re Bethell,* 38 Ch. D. 220, as summarized in 3 Beale's Cases on Conflict of Laws, 31, note. That this distinction is valid when applied to status as well as when applied to contracts, see the decision of Judge Ware in the case of *Polydore v. Prince,* 1 Ware 402, 19 Fed. Cas. 950, No. 11,257, 3 Beale's Cases on Conflict of Laws 2-7, 9. The argument in that case is similar to the argument in the present case. 3 Beale's Cases, 2-3. See also *Somerset v. Stewart,* Lofft, 1, 3 Beale's Cases on Conflict of Laws, 1, Mansfield C. J., holding that the status of slavery, though then recognized as legal in Virginia, "is so odious that nothing can be suffered to support it [in England] but positive law."

And so the court in *Van Matre v. Sankey,* 148 Ill. 536, 3 Beale's Cases on Conflict of Laws, 53, 55, says: "The status of appellee having been established under and by virtue of the *lex domicilii,* is to be recognized and upheld in every other State, unless such status or the rights flowing therefrom are inconsistent with or opposed to the laws and policy of the State where it is sought to be availed of." See also Story, Conflict of Laws, sec. 87; *Shick v. Howe,* 137 Iowa, 249, 114 N. W. 916; *Finley v. Brown,* 122 Tenn. 316, 123 S. W. 359, 364; *In re Williams' Estate,* 102 Cal. 70, 82, 36

Pac. 407, 410, and, as to the general basis of public policy, Black, Judicial Precedents, 163.

In view of the foregoing authorities, the regulations of the bureau of immigration governing the admission of Chinese, in providing for the admission of the "lawful wife and minor children," may be taken to have intended the word "lawful" to apply to the minor children as well as to the wife, and to have intended that word to mean such children as are the fruits of a marriage which it is our policy to recognize./ Rule 2; Rule 9 (a); see also Rule 9 (b).

The policy above suggested disposes of the following argument of counsel, even though it be an argument plausible and of merit:

"At the time of its inception the marriage in China was not recognized as valid here because of a former marriage here still binding, but as soon as the former marriage is dissolved the cause of the failure to recognize here the second marriage is removed. Immediately upon the granting of the divorce the husband returns to his status of a single man and the courts of this jurisdiction are in a position to recognize the marriage in China, which had not been recognized before because of the prior undissolved marriage."

The Hawaiian case of *Kekula v. Pioeiwa*, 4 Haw. 292, throws light on the question raised by the argument just quoted, if not on the question of how far the public policy above expressed by Justice Story and other authorities may be extended. In that case a daughter was born of parents who were cohabiting pending the existence of the father's marriage to another woman. On the death of the lawful wife, the father and mother were married, and the legitimacy of the daughter was claimed under a statute reading, "All children born out of wedlock are hereby declarel legitimate on the marriage of the parents with each other, and are entitled to the same rights as those born in wedlock." This claim was overruled, the court holding that "any other construction of the act would be subversive of good morals."

The effect of this decision has its application here,—which seems to be that where from policy the court cannot recognize the relation of the parents, it cannot recognize the offspring of that relation.

Let the writ of habeas corpus be dismissed.