STATE v. PINK ROSS and SARAH ROSS.

*Fornication and Adultery — Marriage between Negro and White in Another State — Domicil in Another State.*

1. A marriage, solemnized in a State whose laws permit such marriage, between a negro and a white person domiciled in such State, is valid in this State.

2. The domicil of the husband becomes that also of the wife upon marriage.

3. In an indictment for fornication and adultery where the feme defendant (a white woman) left this State for the purpose of evading its laws in consummating a marriage with her co-defendant (a negro) but with no intent to return, and afterwards both of them came to this State to reside; *Held,* that the defendants were not guilty.

(READE and BYNUM, JJ. *Dissenting.*)

(*Hicks* v. *Skinner,* 71 N. C. 539 ; same case, 72 N. C. 1 ; *Williams* v *Oates,* 5 Ire. 535 ; cited, distinguished and approved.)

INDICTMENT for Fornication and Adultery, tried at August Special Term, 1876, of MECKLENBUG Superior Court, before *Schenck, J.*

The defendants are indicted for fornication and adultery in living and cohabiting together without being lawfully married. The cohabition is admitted. Their defence is that they were lawfully married. The facts as found by the special verdict are these : The defendant Pink Ross is a negro man, and the defendant Sarah a white woman. Pink Ross is a native of South Carolina and resided there until August, 1873. Sarah Ross was a resident and citizen of North Carolina up to the time of the marriage between herself and the other defendant. In May, 1873, the defendant Sarah Ross (then Sarah Spake) went to Spartanburg, South Carolina, for the purpose of marrying the other defendant, and with the intention of evading the laws of North Carolina prohibiting marriage between persons of color and white

persons. The defendants were married in South Carolina according to the laws of that State in May, 1873. They lived in that State until August, 1873, as man and wife when they moved to Charlotte, North Carolina.

The laws of South Carolina do not forbid marriage between white persons and persons of color. On this verdict the Judge held that the defendants were not guilty and the State appealed.

*Attorney General*, for the State.
*Messrs. Shipp & Bailey*, for the defendants.

RODMAN, J. (After stating the facts as above.) It will be observed that the verdict states that Sarah went to South Carolina with the intent to evade the law of North Carolina prohibiting the marriage of a negro with a white person. It does not say that she had an intent to return with her husband and live in this State. It is difficult to see how in going to South Carolina to marry a negro, without an intent to return with him to this State, she could evade or intend to evade the laws of this State. Our laws have no extra territorial operation, and do not attempt to prohibit the marriage in South Carolina of blacks and whites domiciled in that State. Such a case differs essentially from one in which both persons, being domiciled in North Carolina, leave the State for the purpose of contracting a marriage forbidden by its law, and with an intent to return to and reside in North Carolina after such marriage; and also from one in which the man alone leaves this State for that purpose and with that intent.

By the marriage of Sarah, the domicil of her husband became hers. And we must suppose that his domicil was *bona fide* in South Carolina until they removed to this State in August, 1873.

It does not appear that any change of domicil was thought of before that time. We must put out of view therefore the supposed intent to evade the law of North Carolina, as a conclusion of law unsupported by or repugnant to the facts found in the verdict, and consider the case as if both parties had been domiciled in South Carolina at the time of the marriage. It is clear that upon the marriage the domicil of the husband became that of the wife and for that purpose it would be immaterial whether the marriage took place in the State of the husband or in any other State. Story Confl. Laws, § § 194, 199. It was so held by this Court in *Hicks* v. *Skinner*, 71 N. C. 539; Ibid 72 N. C. 1. In *Warrender* v. *Warrender*, 9 Bligh's Rep. 89; 2 Clark & Finnelly, 488. A man domiciled in Scotland married an English woman in England, and it was held that the matrimonial domicil was Scotland. This view seems to have been overlooked as it is not alluded to in *Williams* v. *Oates*, 5 Ire. 535, which is therefore apparently opposed to our opinion on this point. But the judgment of the Court may be sustained on the ground that the marriage in question there was not shown to be valid in South Carolina.

The question thus presented is an important one. The State of North Carolina, with the general concurrence of its citizens of both races, has declared its conviction that marriages between them are immoral and opposed to public policy as tending to degrade them both. It has therefore declared such marriages void. It is needless to say that the members of this Court share that opinion. For that reason it becomes us to be careful not to be unduly influenced by it in ascertaining, not what the law of North Carolina is upon such marriages contracted within her limits—that is found in the Act of Assembly and is beyond doubt—but what the law of North Carolina is upon the question presented, and for that we must look beyond the statutes of the State.

If we are right in our conception of the question presented, to-wit; whether a marriage in South Carolina between a black man and a white woman *bona fide* domiciled there and valid by the law of that State, must be regarded as valid in this State when the parties afterwards migrate here? We think that the decided weight of English and American authority requires us to hold that the relation thus lawful in its inception continues to be lawful here.

We know of but two cases which appear to be to the contrary, which will be found in 10 La. An. 411, and 15 *Ibid*, 342. Mr.. Bishop in noticing the first of these cases has. thought it fit to speak of the people whose Court decided them in a tone not to have been expected from a philosophic jurist. *Telum imbelle.*

The general rule is admitted that a marriage between citizens of a foreign State contracted in that State and valid by its laws is valid everywhere where the parties might. migrate, although not contracted with the rites required by the law of the country into which they come and between persons disqualified by such law from intermarrying. *Williams* v. *Oates,*5 Ire 535 ; *Brook* v. *Brook,* 9 H. L. 193 ; Story Confl. Laws, § § 81--113, *Dalrymple* v. *Dalrymple,* 2 Hagg. Consist. Rep. 416.

It is contended however by the Attorney General that. there is an exception to this rule as well established as the rule itself, viz ; that incestuous and polygamous marriages. although lawful in the country in which they are contracted,. will not be recognized in other States in which such marriages are deemed immoral and are prohibited. And it is. further argued that a marriage between persons of different. races is as unnatural and as revolting as an incestuous one, and is declared void by the law of North Carolina.

The exception certainly exists notwithstanding a *dictum.* of a very great Judge to the contrary in *Williams* v. *Oates,* 5. Ire. 535.

STATE *v.* ROSS.

Story (§ 113a) says, " The most prominent if not the only known exceptions to the rule are those marriages involving polygamy and incest; those positively prohibited by the public law of a country from motives of policy ; and those celebrated in foreign countries by subjects entitling themselves under special circumstances to the benefit of the laws of their own country."

On examining the illustrations of these exceptions given by the author, it will be seen that they are considerably limited. Thus all Christian countries agree that marriages in the direct line and between the nearest collaterals, are incestuous, and that polygamy is unlawful, consequently such marriages will be held null everywhere, because they were null in the place of the contract. But beyond these few cases in which all States agree, there is a difference as to what marriages are incestuous, and in such cases the admitted international law leaves it to each State to say what is incestuous in respect to its own subjects. In England, a marriage with the sister of a deceased wife is held incestuous and between persons domiciled in England it will be held void wherever contracted. *Brook* v. *Brook,* 9 H. L. 193. But it does not follow that such a marriage contracted in a State where it was lawful, between subjects of that State, would be held void in England if the parties afterwards became domiciled there. There is no reason to think it would be. Story § 116, 116 a. Still stronger are the illustrations given in § § 95, 96.

However revolting to us and to all persons, who by reason of living in States where the two races are nearly equal in numbers have an experience of the consequences of matrimonial connexions between them, such a marriage may appear, such cannot be said to be the common sentiment of the civilized and Christian world. When Massachusetts held such a number of negroes as to make the validity of such marriages a question of practical importance her sentiments

and her legislation were such as ours are to-day. *Medway v. Needham*, 16 Mass. 157. Now since she has got rid of her negroes the question is of no practical importance to her. And as far as may be gathered from her statute book she considers such marriages unobjectionable. Most of the States of the Union and of the nations of Europe with whom the question is merely speculative take a similar view of it.

It is impossible to identify this case with that of an incestuous or polygamous marriage admitted to be such *jure gentium*. The law of nations is a part of the law of North Carolina. We are under obligations of comity to our sister States. We are compelled to say that this marriage being valid in the State where the parties were *bona fide* domiciled at the time of the contract must be regarded as subsisting after their immigration here.

The inconveniences which may arise from this view of the law are less than those which result from a different one. The children of such a marriage, if born in South Carolina, could migrate here and would be considered legitimate. The only evil which could be avoided by a contrary conclusion is that the people of this State might be spared the bad example of an unnatural and immoral but lawful cohabitation. The inconveniences on the other side are numerous, and are forcibly stated in *Scrimshire* v. *Scrimshire*, 2 Hagg. Consist. Rep. 417, and in Story, § 121. "And therefore all nations have consented or are presumed to consent, for the common benefit and advantage, that such marriages shall be good or not according to the law of the country where they are celebrated."

Upon this question above all others it is desirable (altering somewhat the language of Cicero with which Story concludes his great work) that there should not be one law in Maine and another in Texas, but that the same law shall prevail at least throughout the United States.

There is no error in the judgment below.   Let this opinion be certified.

READE, J. *Dissenting.*  No nation can make laws for another nation.   Each is independent and makes its own laws.   But by common consent of all nations, certain rules have been established for their intercourse, and these rules constitute the law of nations.   And their observance is compelled by force if necessary.   This is denominated public international law.   Wheaton's International Law, § 77.

As distinguished from *public* international law for the conduct of nations *as nations,* there are  private international laws for the conduct, not of nations as nations, but of the people of different nations, by which it is tacitly agreed that rights acquired, privileges enjoyed, and relations formed in one nation, shall be recognized in another nation.   But it is expressly laid down that this is only by *comity,* and is never allowed where it contravenes a prohibitory enactment.   Ibid, § 79.

No nation is bound to admit the laws and customs of another nation within its borders.   It is independent in its Legislation and can by positive enactments refuse the operation of any law or custom of any other nation or people.   I speak of the power and not of the *propriety.*  If a nation should deny to the people of other nations just and reasonable privileges, it would find its punishment in having the same privileges denied to its citizens.   And therefore comity, courtesy, is allowed to govern.   A marriage formed in Scotland where nothing is required but the consent of the parties, we allow to be valid here, although it would be invalid if formed here; because it is a mere matter of form and we courteously recognize it.   It inflicts no harm upon our people.   But suppose Scotland were to allow children of ten years of age to marry, would we allow the marriage to be good here?

Probably we might allow it in the absence of a positive enactment; but we require our own people to be, the male sixteen and the female fourteen years of age; or else the marriage is void; and why may we not prohibit it in foreigners? We prohibit it among our own people, not out of caprice, but to prevent improvident marriages to the degradation and injury of the community. I give this illustration because France which has fixed ages for marriages as we have will not recognize a marriage celebrated elsewhere within the ages, although valid where celebrated. Wheat. § 93. The rule is thus laid down in Wheaton, § § 90–1. "A contract valid by the law of the place where it is made is generally speaking valid everywhere. The general comity and mutual convenience of nations have established the rule, that the law of that place governs in everything respecting the form, interpretation, obligation and effect of the contract wherever the authority, rights and interests of other States and their citizens are not thereby prejudiced. * * . * * It cannot apply where it would injuriously conflict with the laws of another State relating to its police, its public health, its commerce, its revenue, and generally its sovereign authority and the rights and interests of its citizens."

In other words comity is secondary to the public good of any given nation, and subject to be contravened by its positive enactments. I timidly but very positively deny what a great Judge (Ruffin) has said, that a Turk with his many wives, or a Mormon, can have his rights which he has in his own country recognized here, because it is revolting to our people and against their best interests. Our law prohibits the intermarriage of whites and blacks and declares such marriages "void."

If such a marriage solemnized here between our own people is declared void, why should comity require the evil to be imported from another State? Why is not the relation severed the instant they set foot upon our soil? It is

answered that we would thereby bastardize the issue and disturb the rights of property. Not at all. That does not follow. If they have issue before they come here, the status of the issue may not be changed; and by separating them we prevent issue here. Nor need their rights of property be affected. However that is not before us. And at any rate the public good is paramount. And individuals who have formed relations which are obnoxious to our laws can find their comfort in staying away from us. We give to comity all the force of a constitutional provision when we allow it to annul a statute. Indeed we put it above the Constitution itself; as I believe one of the late amendments prohibits the intermarriage of white and colored. It is inherent in every nation to prohibit whatever is an evil to its society. And it must be its own judge of what is an evil. Self-preservation requires it. *State* v. *Reinhart and Love*, 63 N. C. 547.

That provision in the Constitution of the United States, "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States" does not mean that a citizen of South Carolina removing here may bring with him his South Carolina privileges and immunities; but that when he comes here he may have the same privileges and immunities which our citizens have. Nothing more and nothing less. It is courteous for neighbors to visit and it is handsome to allow the visitor family privileges and even to give him the favorite seat; but if he bring his pet rattlesnake or his pet bear or spitz dog famous for hydrophobia, he must leave them outside the door. And if he bring small pox the door may be shut against him.

I am of the opinion that a prohibitory statute is paramount to what might otherwise be allowed as comity, and that the defendants are guilty.

PER CURIAM. Judgment affirmed.