THE STATE v W. T. CUTSHALL.

*Bigamy—Constitutional Law—Marriage—Jurisdiction—Extra-*
*territorial Crimes—Statute—Legislative Powers.*

The statute of North Carolina (*The Code*, § 988) which declares that "any
person who being married, shall marry any other person during
the life of the former husband or wife, whether the second mar-
riage shall have taken place in the State of North Carolina or else-
where, shall be guilty of felony," is an unconstitutional exercise
of legislative power, and inoperative in so far as it attempts to
constitute a second, or bigamous, marriage in another State with-
out the subsequent living together of the parties, a crime in North
Carolina.

SHEPHERD, J., concurring, and MERRIMON, C. J., dissenting.

The defendant was arraigned at August Term, 1891, of
the Criminal Court of MECKLENBURG County, before *Meares,
J.,* upon the following indictment:

"The jurors for the State, upon their oaths, do present, that
W. T. Cutshall, late of Mecklenburg County, on the 1st day
of January, A. D. 1880, did marry a woman whose name is
to the jurors unknown, and the said person last mentioned
the said W. T. Cutshall then and there had for a wife, and
that the said W. T. Cutshall afterwards, to-wit, on the 1st
day of March, A. D. 1890, with force and arms, in York
County, South Carolina, feloniously and unlawfully did
marry and take to wife one Susan Ella Pickard, of the
County of Mecklenburg, in the State of North Carolina, and
to the said Susan Ella Pickard then and there was married,
the said unknown woman, his former wife, being then alive,
contrary to the form of the statute in such case made and
provided, and against the peace and dignity of the State.

"And the jurors aforesaid, upon their oaths aforesaid, do
further present that said W. T. Cutshall, late of Mecklenburg
County, on the 1st day of January, 1880, did marry one ____,
a woman whose name is to the jurors unknown, and the said

person last mentioned the said W. T. Cutshall then and there had for a wife, and that the said W, T. Cutshall afterwards to-wit, on the 1st day of March, A. D. 1890, with force and arms, in York County, South Carolina, feloniously and unlawfully did marry and take to wife one Susan Ella Pickard, of the County of Mecklenburg, in the State of North Carolina, and to the said Susan Ella Pickard then and there was married, and afterwards, to-wit, on said 1st day of March, A. D. 1890, did return to Mecklenburg County, North Carolina, with said Susan Ella Pickard, and then and there did live with her as man and wife, the said unknown woman, his former wife, being then alive, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State.

"And the jurors aforesaid, upon their oaths aforesaid, do further present that W. T. Cutshall, late of Mecklenburg County, on the 1st day of January, A. D. 1880, did marry one _____, a woman whose name is to the jurors unknown, and the said person last mentioned the said W. T. Cutshall then and there had for a wife, and that the said W. T. Cutshall afterwards, to-wit, on the 1st day of March, A. D. 1890, being then and there a resident of the County of Mecklenburg and State of North Carolina, with force and arms feloniously and unlawfully did procure and induce one Susan Ella Pickard to accompany him to York County, in the State of South Carolina, with intent then and there unlawfully and feloniously to marry the said Susan Ella Pickard, the said unknown woman, his former wife, being then alive, and with intent thereafter to return to the County of Mecklenburg, and State of North Carolina, and to live with the said Susan Ella Pickard as his wife, and intending thereby to commit a fraud upon the laws of North Carolina against the crime of bigamy, and that the said W. T. Cutshall, on the said 1st day of March, A. D. 1890, with force and arms feloniously, and in pursuance of the said fraudulent intent, did

procure and induce said Susan Ella Pickard to accompany him to York County, in said State of South Carolina, and her, the said Susan Ella Pickard, with force and arms, feloniously and unlawfully then and there did marry and take to wife, the said unknown woman, his former wife, being then alive, and that thereafter, to wit, on said 1st day of March, A. D. 1890, the said W. T. Cutshall, with force and arms, feloniously and unlawfully, and in pursuance of his said fraudulent purpose, did return to the County of Mecklenburg, and State of North Carolina, and then and there did bed and cohabit with the said Susan Ella Pickard, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."

A *nolle prosequi* was entered as to the third count. Upon being called upon to plead, the defendant moved to quash the indictment, which motion was allowed, and the State appealed.

*The Attorney General*, for the State.
No counsel for defendant.

AVERY, J.: The statute (*The Code*, § 988) provides that "If any person being married, shall marry any other person during the life of the former husband or wife, whether the second marriage shall have taken place in the State of North Carolina or elsewhere, every such offender, and every other person counselling, aiding or abetting such offender, shall be guilty of a felony, and imprisoned in the penitentiary or county jail for any term not less than four months nor more than ten years, and any such offence may be dealt with, tried, determined and punished in the county where the offender shall be apprehended or be in custody, as if the offence had been actually committed in that county."

The general rule is that the laws of a country "do not take effect beyond its territorial limits, because it has neither the

interest nor the power to enforce its will," and no man suffers criminally for acts done outside of its confines. 1 Bishop Cr. L. (7th Ed.), §§ 109 and 110; *People* v. *Tyler*, 3 Cooley (Mich.), 161; *Ibid.*, 4 Cooley, 335; *State* v. *Barnett*, 83 N. C., 616; *State* v. *Brown*, 1 Haywood, 100 (116).

In the case of *State* v. *Ross*, 76 N. C., 242, the Court said: "Our laws have no extra-territorial operation, and do not attempt to prohibit the marriage in South Carolina of blacks and whites domiciled in that State," thus recognizing the principle, generally accepted in America, that a State will take cognizance, as a rule, only of offences committed within its boundaries. Among the exceptions to this general rule are the cases where one, being at the time in another State or country, does a criminal act which takes effect in our own State, as where one who is abroad obtains goods by false pretences or circulates libels in our own State, and contrary to our laws or from a standpoint beyond the line of our State fires a gun or sets in motion any force that inflicts an injury within the State, for which a criminal indictment will lie. 1 Bishop Cr. Law, § 110; *Horn* v. *State*, 4 Texas, 659; *Cambose* v. *Mappell*, 2 Wash. (C. C. R.), 98.

Persons guilty of such acts are liable to indictment and punishment when they venture voluntarily within the territorial bounds of the offended sovereignty, or when, under the provisions of extradition laws or the terms of treaties, they are allowed to be brought into its limits to answer such charges.

As a rule, the validity of marriages contracted in any foreign country must be determined by the Courts of another nation with reference "to the law of the country, wherein they exchange the mutual consent to be husband and wife, which consent alone is by the law of nature a perfect marriage." 1 Bish. on M. and D., §§ 855 and 856; *State* v. *Ross*, *supra*. Such marriages may be declared unlawful, not simply because they are contrary to the law of the State in

which the question arises, but for the reason that they fall under the condemnation of all civilized nations, like marriages between persons very nearly related or those that are polygamous. · 1 Bish. on M. and D., §§ 857 to 862. So a foreigner, not accredited to another government as a representative of his own nation, is subject to the law of the country in which he may travel or establish a temporary domicile, and may be tried in its tribunals for any violation of its criminal laws while within its territorial limits.

Wheaton (in his treatise on International Law, § 127, note 77) says, "In Great Britain, France and the United States, the general principle is to regard crimes as of territorial jurisdiction. * * * The question whether a State shall punish a foreigner for a crime previously committed abroad against that State or its subjects, also depends upon its system respecting punishing generally for crimes committed abroad, Great Britain and the United States respecting strictly the principle of the territoriality of crime."

While, in our external relations with other nations, our federal head, the United States, is the only sovereign, for the purpose of internal government, such portion of the sovereign power as has not been surrendered to the general government is retained by the States. 11 Am. & Eng. Enc., p. 440, and notes.

In the exercise of their reserved powers, especially in the execution of the criminal law, questions arise which are settled and determined either according to the principles of international law or by analogy to them. It is contended that nothing but comity between nations, in the absence of express provisions of treaties, prevents one nationality from making laws to punish persons who commit criminal offences in another country and afterwards come within its territory, and that admitting this principle to be correct, there can be no treaty stipulation, and there is in fact no constitutional inhibition, that restricts the Legislature of one of our inter-

nal sovereignties from enacting laws to punish a person who comes into its domain, so as to be apprehended there for a crime committed in a sister State.

Article 29 of the confirmatory charter granted by Henry III, provided that "No freeman should be taken or imprisoned or disseized of freehold or liberties, or free cus'oms, or be outlawed or exiled, or any otherwise destroyed, nor will we pass upon him or condemn him but by lawful judgment of his peers, or by the law of the land."

In the formal Declaration of Independence, the King of Great Britain, after being charged with many violations of fundamental principles and invasions of common rights, was arraigned before the world "For depriving us in many cases of trial by jury; for transporting us beyond the seas to be tried for pretended offences." This language evinces the purpose of our representatives to risk their lives and their fortunes, in part at least, to secure not simply the ancient right of trial by jury, but trial by a jury of the vicinage within easy reach of all evidence material for the vindication of the accused, where the charge might prove unfounded upon a fair investigation.

During the same year these principles were embodied in the Declaration of Rights by the Colonial Congress, in what now constitute sections 13 and 17 of Article I of the Constitution, which are as follows: "13. No person shall be convicted of any crime but by the unanimous verdict of a jury of good and lawful men." Sec. 17. "No person ought to be *taken, imprisoned* or disseized of his freehold, liberties, or privileges, or outlawed or exiled, or *in any manner* deprived of his life, liberty, or property, but by the law of the land."

Not only has section 13 been construed to guarantee to every person (whether a citizen of this State or of another Commonwealth) a trial by jury in all cases, which are so triable at common law (such as an indictment for a felony), but a trial by his peers of the vicinage, unless, after indict-

ment, it should appear to the Judge necessary to remove the case to some neighboring county in order to secure a fair trial. Judge COOLEY says (Const. Lim , marg., pp. 319, 320): "Many of the incidents of a common law trial by a jury are *essential elements of right.* The jury must be indifferent between the prisoner and the Commonwealth, and to secure impartiality challenges are allowed, both for cause and also peremptory without assigning cause. The jury must also be summoned from the vicinage where the crime is supposed to have been committed; and the accused will thus have the benefit on his trial of his own good character and standing with his neighbors, if these he has preserved, and also of such knowledge as the jury may possess of the witness who may give evidence against him. He will also be able with more certainty to secure the attendance of his own witnesses." *Kirk* v. *State,* 1 Cold. (Tenn.), 344; *Armstrong* v. *State,* 1 Cold., 338; *State* v. *Denton,* 6 Cold., 539. This strong language is used in commenting upon the clause, which, in substantially the same terms, guarantees the right of trial by jury in all serious criminal prosecutions in everyone of the States.

Mr. Charles A. Dana published some years since an article in his paper, the *New York Sun,* which it was claimed was libelous in its strictures upon the conduct of a public official at Washington City, and Judge Blatchford, upon his being arrested in New York City by virtue of a warrant of a United States Commissioner and brought to Washington, heard the facts, after granting a writ of *habeas corpus,* and discharged the prisoner. *Matter of Dana,* 7 Ben. (D. C.), 1. Commenting upon this case, Judge COOLEY said: " It would have been a singular result of a revolution, where one of the grievances complained of was the assertion of a right to send parties abroad for trial, if it should have been found that an editor might be seized anywhere in the Union and transported by a Federal officer to every territory in which his paper

might find its way, to be tried in each in succession for offences which consisted in a single act not actually done in any of them." If every State of the American Union should enact a statute identical in its terms with that under which the indictment is drawn (*The Code*, § 988), the enforcement of these laws might lead to just such a series of prosecutions as the learned jurist seemed to consider so absurd, outrageous and palpable a violation of a fundamental right asserted in our own national *Magna Charta*, the Declaration of Independence. The defendant might travel through any or all of the States, and be apprehended or in custody in any one or all of them, and thus subject himself to indictments for an offence not committed in any jurisdiction where he is tried.

Every State has embodied in its organic law the guarantee that no person shall be taken or imprisoned, etc., "but by the law of the land," and this term Judge COOLEY treats as synonymous with "due process of law." Const. Lim., marg., p. 353. "Due process of law not only requires that a party shall be properly brought into Court, but that he shall have the opportunity when in Court to establish any fact which, according to the usages of the common law or the provisions of the Constitution, would be a protection to him or his property." Cooley's Const. Lim. (4th Ed.), 460, (marg., p. 369); *Taylor* v. *Miles*, 5 Kansas, 498.

In *Hoke* v. *Henderson*, 4 Dev., 16, Chief Justice RUFFIN said: "The clause itself (Art. 1, sec. 17, Cons.) means that such legislative acts as profess in themselves directly to *punish persons*, or to deprive the citizen of his property, without trial before the judicial tribunals, and a decision upon the matter of rights, as determined by the laws under which it vested, according to the course, mode and usages of the common law as derived from our forefathers, are not effectually 'laws of the land' for those purposes."

110 — 35

After the Federal Constitution had been ratified, the people of the States, with the recollection of the flagrant invasion of their rights by transporting freemen abroad to be tried for "pretended offences" still fresh, amended it so that, says Ordronaux, " the crime and its punishment are attached to the jurisdiction within which it was committed." Ordronaux Cons. Leg., 259; Constitution of U. S., Art. III, sec. 2, clause 3.

These amendments apply only to Federal tribunals; but the fact that they were prohibited from trying, except in the State where the crime should be committed, is evidence of a purpose to put it beyond the power of Congress to have a citizen tried for a criminal offence except by a jury of the vicinage, and at a point not so remote as to deprive him of the benefit of his witnesses.

Another amendment (Art. IV, sec. 2, cl. 2) supplements that already referred to, and shows by its terms that the purpose in enacting it was "to definitely localize the forum of every crime committed by a person not in the land or naval forces, by providing for the extradition of criminals on demand of the Governor "to the State having jurisdiction of the crime." It was evidently contemplated by the framers of the Constitution, that ordinarily there would be but one State where a crime could be properly said to have been committed and whose Courts would have cognizance of it. It was natural that they should cling to the old territorial rule which limited the jurisdiction to the Courts of the county.

The State of South Carolina was the sovereign whose authority was disregarded when the bigamous marriage was celebrated. If the defendant married a second time in South Carolina, or elsewhere outside of North Carolina, the act had no tendency at the time to affect society here, nor can that unlawful conduct be punished as a violation of our criminal laws. On the other hand, the completed act of entering

into a second marriage in a neighboring State is not anala-
gous to the cases where a mortal wound is inflicted in one
State, and the wounded man lingers and dies from its effects
within the limits of another State during the next ensuing
twelve months.

It is needless now to discuss the question, whether on
account of the fact that the ultimate effect of the wound is
the resulting death, the State in which the death occurs in
such cases should not be held to have common law jurisdic-
tion to try the murder, since nearly all of the States have
enacted statutes providing for such trials, and some of them
have declared such enactments essential. *Commonwealth* v.
*McLorn,* 101 Mass., 101; Bishop's Cr. Law, sections 112 to 117.
Our statute is a re-enactment of that passed in England, in the
assertion of the almost omnipotent power of the Parliament,
yet, as we have seen by reference to Wharton's statement of
the rule adopted in England as to jurisdiction of crimes, the
Courts of that country would never have held "elsewhere"
to refer to bigamy committed by citizens of other nationali-
ties, but to second marriages contracted by her own subjects,
while a former wife or husband was living. Parliament is
not, of course, prohibited by any constitutional provision
from passing an act which makes a particular offence, con-
trary to the general rule, indictable and punishable, not only
in a country of England other than that in which it is com-
mitted, but when committed in a different dominion of the
empire of a foreign land. *Walls* v. *State,* 32 Ark., 568; 2
Wharton's Cr. Law, section 1685. The powers of Congress
on this subject are well defined in the Constitution, and the
powers of the States are limited by the clause we have cited
and others, as well as by the nature of our government, con-
taining, as we look upon it, internally, as many sovereign-
ties as there are States. Our statute was not amended so as
to incorporate the English idea until *The Code* was enacted in
1893; but it seems that in most of those States where atten-

tion was attracted to the subject at an earlier date, the Legislatures doubted their power to make the act done in another State punishable as a felony, merely because the offender placed himself within reach of criminal process of his own State. But according to the express terms of their statutes, the offence was not the act of unlawfully marrying a second time, but the continuous bedding and cohabiting afterwards. *Commonwealth* v. *Bradley*, 2 Cush., 552; *Bower* v. *State*, 59 Ala., 102; *State* v. *Palmer*, 18 Vt., 570. The statute of the State of Missouri, by its very terms, seems to amount to a recognition of the principle which, we insist, is the correct one. It provides that " every person having a husband or wife living, who shall marry another person without this State, in any case where such marriage would be punishable if contracted or solemnized within this State, and shall afterwards cohabit with such person within this State, shall be adjudged guilty of bigamy, and punished in the same manner as if such second marriage had taken place within this State." *State* v. *Fitzgerald*, 75 Mo., 571. It is the subsequent cohabitation, and not the fact that the person simply invades the jurisdiction of its Courts, which subjects the offender to the same punishment as would the bigamous marriage had it been celebrated within that State. Under our statute we provide for the punishment of any person who has contracted a bigamous marriage in another State, if he can be caught here, even in *transitu* to another State. The attempt to evade the organic law by making the coming into this State (after committing an offence in another) a crime is too palpable, in view of the admitted fact that the Constitution of the United States gives to citizens of all the States the immunities and privileges of its own citizens, and of their guaranteed right under the Interstate Commerce clause, to pass through another State without arrest and inquiry into their accountability for offences against their own sovereignty, but especially because the trial for the new

felony involves an investigation of the original bigamy by a jury not of the vicinage and remote from the witnesses.

No Court has ever questioned the power of a State to pass quarantine laws and statutes regulating the entrance of paupers within its limits, but this does not include the authority to impose a tax per capita, even on immigrants from a foreign nation arriving at its ports, or on passengers in *transitu* from one State to another. *Norris* v. *Boston,* and *Smith* v. *Turner,* 6 Myers' Fed. Digest, 665, 675, 677, 678 and 684. Mr. Justice WAYNE, in the case last cited, said: "Some reliance in the argument was put upon the cases of *Holmes* v. *Jennison,* 14 Peters, 546; *Groves* v. *Slaughter,* 15 Peters, 449, and *Priggs* v. *Commonwealth,* 16 Peters, 539, to maintain the discretion of a State to say who shall come to and live in it. Why either case should have been cited for such a purpose, I was at a loss to know, and have been more so from a subsequent examination of each of them. All that is decided in the case of *Holmes* v. *Jennison,* is that the States of the Union have no constitutional power to give up fugitives from justice to the authorities of a nation from which they have fled. That it is not an international obligation to do so, and that all authority to make treaties for such a purpose is in the United States." The learned Justice, in a subsequent portion of the same opinion (p. 684), said: "I have never, in any instance, heard the case of Miln cited for the purpose of showing that persons are not within the regulating power of Congress over commerce, without at once saying to the counsel that that point had not been decided in that case. * * * * Indeed, it would be most extraordinary if the case of *Gibbons* v. *Ogden,* 9 Wheaton, 1, could be considered as having been reversed by a single sentence in the opinion of *New York* v. *Miln,* 11 Peters, 102, upon a point, too, not in any way involved in the certificate of division of opinion by which that case was brought to this Court. The sentence is that 'they (persons) are not the subjects of commerce, and, not being imported

goods, cannot fall within a train of reasoning founded upon a construction of a power given to Congress to regulate commerce, and the prohibition to the States from imposing a duty on imported goods.'" It thus appears that the language relied upon to sustain the assertion on the part of a State of the power to legislate in reference to persons coming from a foreign country has been expressly declared a *dictum*, and overruled. This principle approved by the Court is still more explicitly stated in *Henderson* v. *Mayor of New York*, 2 Otto, 259, and in *Chy Lang* v. *Freeman, Ibid,* 275. The Court suggested in the latter case that, in the absence of all legislation on the subject by Congress, a State might possibly assume authority to prohibit the entrance from abroad of "paupers and convicted criminals." A treaty entered into by the United States at once operates as a repeal of all State laws repugnant to its provisions. *Baker* v. *City of Portland*, 5 Saw., 566; *Denn* v. *Herndon*, 1 Paine, 59; *In re* Parrott, 1 Feb. Reporter, 81; *Gordon* v. *Kerr*, 1 Wash., 322. "It is not competent for the Legislature of a State to deprive a citizen of any other State of his legal or equitable rights under the Constitution and laws of Congress, by declaring that they must be enforced in a local Court." *Armory* v. *Armory*, 18 Int. Rev. Rec., 149. Our statute applies, by its terms, as well to a citizen of another State who in *transitu* affords to our local authorities the opportunity to apprehend him, as to those who become domiciled within our borders. As a citizen of another State, he has the privilege of demanding a trial in a particular locality, and by a jury of the vicinage, and it would deprive him of that right guaranteed by the Federal Constitution, to arrest him while temporarily in this State under the pretence of punishing him for the felony of coming into the State after a bigamous marriage, try him remote from the locality where the marriage was celebrated and his witnesses reside, for an offence involving only the question whether the second marriage was in fact bigamous.

Wharton (2 Cr. Law, § 1685), after discussing the English statute, says: "In some of the United States a similar statute has been enacted, in others a continuance in the bigamous state is made indictable, no matter where the second marriage was solemnized. But when the act of bigamous marriage is made the subject of indictment, then at common law the place of such act has exclusive jurisdiction." The Court of Alabama has expressly held (in *Biggs* v. *The State*, 55 Ala., 108) that where a person is indicted for the bigamous act of marrying a second time in another State, as distinguished from continuing to cohabit within the State after such marriage, the indictment could not be sustained, but the Court did not find it necessary in that case to discuss the question of legislative power, as the Legislature had modified the English statute in the same way that it had been altered by law in Vermont, Massachusetts, Tennessee, Missouri and other States.

It will not be insisted that the Courts of the State of Maine would have power to enforce a statute which provided for punishing with death any person who had committed murder in another State and then gone within its limits, by apprehending a Texan and requiring him to send to the banks of the Rio Grande for testimony to meet and refute that of a malignant neighbor who had followed him almost across the continent to wreak his vengeance. If a State has the power to punish one caught within its borders as a felon for a bigamous marriage committed within another State, what is to prevent the trial of a citizen found in a neighboring State for a homicide, if the statute were broad enough to include murder as well as bigamy—if the statute made it a felony punishable with death to come into the State after committing murder in another? The assertion of such authority would jeopardize the security of every American citizen who ventured beyond the confines of the State in which he resided. The express provision for the extradition

of criminals excludes the idea of trying them outside of the limits of the State where the offence is committed, even if there were no direct guarantee that they should not be subject to arrest and trial for offences against their own sovereign when beyond her limits.

The additional counts, in which it is charged that the defendant, after the bigamous marriage in South Carolina came into North Carolina and cohabited with the person to whom he was married, cannot be sustained, because that offence is not covered by our statute. The North Carolina statute would, if enforced, subject him to indictment if he should come across the border and leave the woman behind.

While we do not recognize the validity of marriages of parties when they leave the State for the purpose of evading a law which makes a marriage between them unlawful, and with the intent, after celebrating the rites in another jurisdiction, to return and live in this State (*State* v. *Kennedy*, 76 N. C., 251), we have no express statute making such acts indictable as a felony, not as a misdemeanor, where they live in adultery here. *State* v. *Cutshall*, 109 N. C., 764. This fact is fatal to another count of the indictment. But we do not wish to be understood as questioning the power of the State to punish one of its citizens who goes out of the State with intent to evade its laws by celebrating a bigamous marriage beyond its jurisdiction and returning to live within its borders.

For the reasons given, we think that there was no error in the judgment of the Court below quashing the indictment, and it is ᴏ ᴠ ʟ ʀ ʀᴜʟ ᴇᴅ

SHEPHERD, J.: I concur in the conclusion that the indictment was properly quashed.

MERRIMON, C. J. (dissenting):. The indictment charges the defendant with the crime of bigamy, as defined and forbidden by the statute (*The Code*, § 988). It charges that the second marriage took place in the State of South Carolina, and that shortly thereafter the defendant came into the county of Mecklenburg and there resided with the second wife. He appeared, and moved to quash the indictment upon the ground that it appeared from it that he had committed no offence in this State. · The motion was allowed, whereupon the Solicitor for the State assigned error and appealed to this Court.

The statute declares that "If any person, being married, shall marry any other person during the life of the former husband or wife, whether the second marriage shall have taken place in the State of North Carolina or elsewhere, every such offender and every person counselling, aiding and abetting such offender, shall be guilty of felony, and imprisoned in the penitentiary or county jail for any term not less than four months nor more than ten years; and any such offence may be dealt with, tried, determined and punished in the county where the offender shall be apprehended, or be in custody, as if the offence had been actually committed in that county," etc. (*The Code*, § 988). This enactment is not very aptly, precisely or clearly expressed, and hence its validity is seriously questioned. But it must receive such reasonable interpretation as will render it intelligible, operative and effectual, if this can be done consistently with the Constitution.

It does not necessarily imply or intend that the offender shall be indictable and convicted in this State for the offence of bigamy in another State; such is not its meaning. It intends that whoever shall be in this State, being married to two living wives, or two living husbands, as the case may be (except in the cases excepted in the proviso to the statute), shall be guilty of felony, and that without regard to whether

the second marriage took place in this State or elsewhere, and without regard to whether the second marriage constituted the offence of bigamy in the State or country where it took place. It makes the bigamist here answerable because he is here, an offence to, and an offender against this State and society here. The fact of bigamy—having two living wives or two living husbands—and the presence of the offender in this State constitute the offence. It is not simply the second marriage that constitutes the offence—the felony—but it is the existence of that fact and the presence of the offender in this State that makes it. The statute does not treat the second marriage as the offence, nor the *offence* as committed elsewhere than in this State.

It is said that in such case no offence is committed in this State or against it. This is a serious misapprehension. The statute, its purpose, makes the presence of the bigamist in this State an offence—makes him here a bigamist and guilty of a felony, whether he was so where the second marriage took place or not. Suppose the statute under consideration had declared in terms that if a bigamist shall come into this State, he shall be deemed and held to be guilty of bigamy and felony here, could its validity be seriously questioned? This is what the statute, in effect, declares.

The Legislature, in the exercise of the essential police powers of government, may, for the protection of the people, the safety and purity of society, exclude from its borders criminals of other States and countries. To that end, it may make their coming here, their presence in this State, a felony, if they were guilty of a specified offence committed by them in the State from which they came, or if they were chargeable with doing specified acts in the State from which they came, constituting no criminal offence there, but declared and deemed to be an offence here. It is their coming into this State, their presence here, and the fact that they did in the State from which they came the acts deemed and held

to be a specified criminal offence here, that constitutes the statutory crime and felony in this State. Such exercise of legislative power may be unusual, and perhaps not very expedient; but the power exists, and it is not the province of Courts to determine when it shall or shall not be exercised. Criminals have no right to commit crime and go from State to State, or from one country to another, and inflict themselves upon society wherever they may be. It is the right and the duty of government to protect itself and its people against them by all manner of appropriate legislation.

It has been suggested that the exercise of such power, except to a very limited extent, is not consistent with that provision of the Constitution of the United States which confers upon Congress the power " to regulate commerce with foreign nations and among the several States, and with the Indian tribes." To what extent and exactly in what respects this provision restricts the exercise of the police power of the States, is not very definitely settled, but it is very clear that it does not inhibit the enactment of statutes like that under consideration. The right of the State to make and enforce such laws is fully recognized in *City of New York* v. *Miln,* 11 Peters, 102. In that case the Court said: " We choose rather to plant ourselves on what we consider impregnable positions. They are these: That a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States. That by virtue of this, it is not only the right, but the bounden and solemn duty of a State to advance the safety, happiness and prosperity of its people, and to provide for its general welfare by any and every act of legislation which it may deem to be conducive to these ends, where the power over the particular subject or the manner of its exercise is not surrendered or restrained in the manner just stated. That all these powers which relate

to merely municipal legislation, or what may perhaps more properly be called internal police, are not surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive."

That case is cited with approval in *Holmes* v. *Jennison*, 14 Peters, 540, Chief Justice TANEY saying for the Court: " Again, the question under this *habeas corpus* is in no degree connected with the power of the States to remove from their territory any person whose presence they may think dangerous to their peace, or in any way injurious to their interest. The power in that respect was fully considered by this Court and decided in the case of *New York* v. *Miln*, 11 Peters, 102. Undoubtedly they may remove from among them any persons guilty of or charged with crime, and may arrest and imprison them in order to effect this object. This is a part of the ordinary police powers of the States, which is necessary to their very existence, and which they have never surrendered to the general government. They may, if they think proper, in order to deter offenders in other countries from coming among them, make crimes committed elsewhere punishable in their Courts, if the guilty party shall be found within their jurisdiction. In all of these cases the State acts with a view to its own safety, and is in no degree connected with the foreign government in which the crime was committed." The first of the cases here cited is to some extent criticised in *Henderson* v. *Mayor*, 92 U. S. Rep., 259, and *Chy Lang* v. *Freeman*, Ibid., 275, but not in the aspect of it material here. It is difficult to see any substantial reason why the Legislature may not by proper enactment make it indictable—a misdemeanor or a felony—for persons who have done acts in one of the States deemed dangerous to its safety, or that of the morals or property or the prosperity of its people, if they be found within its limits. It may by such means keep out of and drive beyond its borders foreign paupers, common gamblers, bigamists, and the like. It must be the

STATE *v.* CUTSHALL.

judge of the wisdom and expediency of such legislation. Offenders against such statutes are such, wherever they may be found in the State, and hence may be tried wherever found, without invading any fundamental right secured to them. The acts forbidden having been done, the presence of the offender in the State anywhere constitutes the offence.

This case is very different from *State* v. *Knight*, 1 Taylor's Reports, 44 (65). In that case the statute declared void, undertook to make the offence of counterfeiting in another State indictable in this State.

The indictment does not charge the defendant with bigamy committed in South Carolina; it charges him with a statutory crime (a felony) committed in this State, one of the essential acts constituting it having taken place in South Carolina. The statute does not make the second marriage the offence, it simply treats this as a fact to be taken in connection with others, all constituting the offence in this State. The offence is wholly statutory in its nature, and must be so treated.

I think the order quashing the indictment should be reversed, and the case disposed of accordingly.

*Per curiam.*                                        Affirmed.