STATE v. WILLIAM HALL and JOHN DOCKERY.

*Fugitive from Justice—Interstate Extradition—Authority of
Governor.*

1. A prisoner arrested and held under the provisions of section 1165 of
   *The Code* cannot be lawfully detained, unless it be made to appear
   · that he is liable to extradition under the Act of Congress, paised
   in pursuance of clause 2, section 2 of Art. IV. of the Constitution
   of the United States.

2. No one can, in any sense, be alleged to have fled from the justice of a
   State in the domain of whose territorial jurisdiction he has never
   been corporally present since the commission of the crime.

3. A fugitive from justice is one who, having committed a crime in one
   jurisdiction, flees therefrom in order to evade the law and escape
   punishment.

4  Where one has been only constructively present in a State by being
   deemed, by a legal fiction, to have followed an agency or instru-
   mentality put in motion by him to accomplish a criminal purpose,
   he is not a fugitive from justice of such State so as to warrant the
   Executive of this State to deliver him to the authorities of such
   State upon the requisition of the Governor of the demanding
   State.·

5. It is competent for the Legislature of a State, in the exercise of its
   reserved sovereign powers, and as an act of courtesy to a sister
   State, to provide by statute for the surrender, upon requisition, of
   persons indictable for murder in such State, although they have
   never "fled from justice."

Proceedings in *habeas corpus*, tried before *McIver, J.*

The petitioners Hall and Dockery were incarcerated in the
jail of Cherokee County, on a warrant issued by a Justice of
the Peace, charging them with being fugitives from justice
from Tennessee for killing in said State one Andrew Bryson.

The Judge refused to discharge the prisoners, and recommitted them to jail to await the warrant of extradition, and they appealed.

After setting out the affidavit and the warrant of the Justice of the Peace, and their arrest thereunder, they show that "at Fall Term, 1892, they were indicted for the murder of Andrew Bryson, and at Spring Term, 1893, were tried and convicted, and appealed to the Supreme Court and obtained a new trial (setting out the judgment of the last-mentioned Court, as reported in 114 N. C. Reports, page 909).

"They further show that at Spring Term, 1894, the judgment and opinion of the Supreme Court were filed in the said Superior Court, and they, being brought to the bar of the Court, demanded a trial by jury, whereupon the Judge informed the Solicitor that he must either try the prisoners, or they would be entitled to their discharge, and thereupon the Solicitor entered a *nol. pros.*, and the prisoners were discharged.

"They further show that immediately thereafter they were arrested and taken in custody by the Sheriff, upon the warrant of the Justice of the Peace, and that they are advised and believe that, under the Constitution and laws of the State and United States, they are entitled to a jury trial upon said indictment in the State of North Carolina, and that they still stand charged with the murder of said Bryson in the Courts of this State, and cannot, whilst so charged, be committed or extradited to the State of Tennessee for trial for the same offence.

"The petitioners further show that at the time of the alleged killing of Bryson they were not in Tennessee, nor have they been in said State since the alleged killing, and they are not fugitives from justice from Tennessee, and they are and ever have been citizens of North Carolina, and at the time of the alleged killing of Bryson were actually in North Carolina, and have not since been in Tennessee.

" They further show that they are not guilty of the alleged murder in the State of Tennessee or elsewhere, and pray that the writ of *habeas corpus* may issue, directed to the Sheriff, or to whomsoever may hold your petitioners in custody, commanding him or them to have your petitioners before your Honor immediately for the purpose of inquiring into the cause of their commitment and detention, and that they be discharged from custody."

His Honor refused to discharge the prisoners, and recommitted them to jail to await the warrant of extradition, and petitioners appealed.

*Mr. G. S. Ferguson,* for petitioners.
*The Attorney General,* for the State.

AVERY, J.: The defendants were arrested, and are now held under the statute (*The Code,* sec. 1165), which provides that any one of certain judicial officers therein named, " on satisfactory information laid before him that any fugitive in the State has committed, out of the State and within the United States, any offence which by the law of the State in which the offence was committed is punishable, either capitally or by imprisonment for one year or upwards in any State prison, shall have full power and authority, and is hereby required to issue a warrant for said fugitive, and commit him to jail within the State for the space of six months, unless sooner demanded by the authorities of the State wherein the offence may have been committed, pursuant to the Act of Congress in that case made and provided," etc. It is manifest that the prisoners cannot be lawfully detained, under the unmistakable language of the law, unless it has been made to appear that they are liable to extradition under the Act of Congress, passed in pursuance of Art. IV., sec. 2, clause 2 of the Constitution of the United States, in order to provide for the surrender of persons

charged with criminal offences " who shall flee from justice
and be found in another State."

The prisoners were tried for murder in Cherokee County,
and, upon appeal, it was held (114 N. C., 909) that if the de-
ceased, at the time of receiving the fatal injury, was in the
State of Tennessee, and the prisoners were in the State of
North Carolina, the Courts of the former commonwealth
alone had jurisdiction of the offence.   The prisoners, if such
were the facts, were deemed by the law to have accompanied
the deadly missile sent by them across the border, and to
have been constructively present when the fatal wound was
actually inflicted.   As our statute confers no power to detain
in custody, or to surrender at the demand of the Executive
of another State, any person who does not fall within the
definition of a fugitive from justice according to the inter-
pretation given by the Courts of the United States to the
clause of the Federal Constitution providing for interstate
extradition, and the Act of Congress passed in pursuance of
it, the only question before us is, whether a person can, in
contemplation of law, " flee from justice " in the State of
Tennessee when he has never been actually but only construc-
tively within its territorial limits.   Upon this question there
is abundant authority, emanating not only from the foremost
text-writers and some of the ablest jurists of the most re-
spectable State Courts, but from the Supreme Court of the
United States, whose peculiar province it is to declare what
interpretation shall be given to the Federal Constitution
and the statutes enacted by Congress in pursuance of its pro-
visions, which are declared by that instrument to be the
supreme law of the land.   If we can surrender under our
statute only fugitives within the meaning of the Act of
Congress, it would seem sufficient to cite *Ex parte* Reggel,
where it is held that a person arrested as a fugitive has a
right " to insist upon proof that he was within the demand-
ing State at the time he is alleged to have committed the

crime charged, and consequently withdrew from her juris-
diction so that he could not be reached by her criminal pro-
cess." It is admitted that the prisoners have never with-
drawn from the jurisdiction of the Courts of Tennessee, and
have never been, either at the time when the homicide was
committed, or since, exposed to arrest under process issuing
from them.

But in a case involving so important a principle, and cal-
culated to excite general interest on the part, especially, of
the legal profession, we feel warranted in not only citing but
quoting from other authorities. Where a person is charged
with cheating by false pretences, by means of a misrepre-
sentation in writing, sent to another State, whereby he pro-
cures something of value in the State to which such writing
goes, he is deemed to be constructively present where the
false pretence is successfully used and where the money or
property is obtained, and is consequently liable to be indicted
and punished there, if he comes within the reach of the
process of its Courts. *People* v. *Adams,* 3 Denio (N. Y.), 190.
But the Supreme Court of Alabama, in a case exactly in
point (*In re* Mohr., 73 Ala., 63), state the principle applica-
ble here with great clearness and force. The defendant was
charged with cheating, by false pretences, a prosecutor in the
State of Pennsylvania, though it was admitted that he had
never actually gone within the limits of that State. The
Court said : "It is clear to our minds that crimes which are
not actually but are only constructively committed within the
jurisdiction of the demanding State do not fall within the
class of cases intended to be embraced by the Constitution
or Act of Congress. Such, at least, is the rule, unless the
criminal afterwards goes into such State and departs from
it, thus subjecting himself to the sovereignty of its jurisdic-
tion. The reason is, not that the jurisdiction to try the
crime is lacking, but that no one can, in any sense, be alleged
to have fled the State in the domain of whose territorial

jurisdiction he has never been corporally present since the commission of the crime." That Court cited, to sustain this view, among other authorities, Wharton's Criminal Pleading (8th Ed.), 231; Kingsbury's case, 106 Mass., 223; *Ex parte* Smith, 3 McLean, 121, and *Wilcox* v. *Noyle*, 34 Ohio St., 520. Bouvier (Law Dict., 551) defines a fugitive from justice as " one, who having committed a crime within one jurisdiction, goes into another in order to evade the law and avoid punishment." The same writer says also that the executive of a State cannot be called upon to deliver up a person charged with a criminal offence in another State, unless it appear that such person " is a fugitive from justice." Rapalje (Law Dict., 555) defines a fugitive from justice as " one, who having committed a crime in one jurisdiction, flees therefrom into another jurisdiction in order to escape punishment." See, also, 1 Abbott's Law Dict., 508, for definition of " fleeing."

To hold that a person, who is liable to indictment only by reason of his constructive presence, is a fugitive from the justice of a State within whose limits he has never gone since the commission of the offence, involves as great an error as to maintain that one who has stood still and never ventured within the reach of another, has fled from him to avoid injury. One who has never fled cannot be a fugitive. *Jones* v. *Leonard*, 50 Iowa, 106; 7 Am. and Eng. Enc., 646, and note 1, and 647. Moore (in his work on Extradition, 2 vol., sec. 582, *et seq.*), after quoting the extract already given from Reggel's case, cites a number of other cases wherein Governors of States, under well-considered opinions of their legal advisers, have recognized and acted upon the principle that a person cannot be said to flee from a place where he has never actually been, but to which, by a legal fiction, he is deemed to have followed an agency or instrumentality, put in motion by him, to accomplish a criminal purpose. Spear (Law of Extradition, pp. 396 to 400) cites and discusses the authorities bearing upon the question whether a person can

be a fugitive from a State into which he has never entered, and not only reaches the same conclusion at which we have arrived, but maintains *arguendo* that a person who has been extradited as a fugitive cannot be sent back from the demanding State on requisition of the Executive who surrendered him, to answer a crime committed while he was a fugitive, because one who is forcibly taken away does not, in contemplation of law or in fact, flee from justice. The author says, that to assume that an abduction by force, though under legal process, is fleeing, "is a gross absurdity, quite as bad as the theory of fugitives by construction."

Had it not been provided by the Constitution of the United States (Art. IV., section 2, clause 2), that "A person charged in any State with treason, felony or other crime, who shall flee from justice and be found in another State, shall, on demand of the Executive authority of the State from which he has fled, be delivered up," etc., the States, as to the right to demand and the power to surrender fugitives from justice, would have sustained relations to each other analagous to those existing between independent nations. *State v. Cutshall*, 110 N. C., 538. If no stipulation by treaty were now in force requiring the Government of the United States to surrender, on requisition of the authorities of Canada, persons charged with murder in that Dominion, those guilty of such crimes would find this country a safe asylum. In the absence of any provision of law imposing upon the Executive of the State of North Carolina the duty of surrendering, on requisition of the Governors of other States, any person charged with a criminal offence in the demanding States, except such as shall be shown to have fled from justice within the meaning of the Federal Constitution, the Governor must search in vain for authority to issue a warrant of extradition in a case like this before us, as was in effect conceded in *In re* Sultan, decided at this term.

'While a statute passed now, and making it murder to wil-

115—52

fully put in motion within the State of North Carolina any force which should kill a human being in a neighboring State, might not be amenable to such constitutional objection as that discussed in *State* v. *Knight*, Taylor's Rep., 65 (44), it would, as to this case, be an *ex post facto* law. But in the exercise of its reserved sovereign powers the State may, as an act of comity to a sister State, provide by statute for the surrender, upon requisition, of persons who, like the prisoners, are indictable for murder in another State, though they have never fled from justice. If it shall be proved that the prisoners were in fact in North Carolina and the deceased in Tennessee when the fatal wound was inflicted, a law may still be enacted giving the Governor the authority to issue his warrant and deliver them on requisition. Meantime, it may be asked, what can be done to provide for this *casus omissus?* We may answer, in the language of Spear, *supra*, page 400, " Nothing, by any extradition process, until there is some authority of law for it. / * * * State statutes may be enacted to furnish a remedy not now supplied by either Federal or State law." Were the Courts, without any semblance of right, to supply the legislative omission, it would be a criminal usurpation of authority, more pernicious to the public interests than the escape of, not two, but scores of criminals. Appellate Courts cannot deliberately legislate for the punishment of crime without incurring a moral accountability as grave as that of the criminal who suffers by the usurpation.

The Attorney General, with commendable frankness, admitted that he could find no authority to sustain his contention. It is not pretended that a single appellate Court Federal or State, or a respectable law writer, has given any other interpretation to the law than that adopted by us. Courts cannot amend or override constitutions and statutes, and, upon the higher law idea, anticipate dilatory Legislatures by providing for the safety of the public in the event

that anarchists should project deadly missiles across a State border. Mobs can be suppressed under the common law, wherever they may assemble for an unlawful purpose and attempt to put such purpose into execution. But if they could not, it would be the duty of the Legislature, not of the Courts, to provide for their suppression. If there is any foundation for apprehending that the disorderly elements of society are watching for opportunity to take life and destroy property, provided they can see a way of escape through the loopholes of defective laws, the representatives of the people must be trusted to meet, if not anticipate, emergencies as they arise. Neither actual nor possible consequences should deter Judges from executing the law as it is plainly written. The *argumentum ab inconvenienti*, when used to bring about a modification of a well-established principle of law, should be addressed to the lawmaker, whose province it is to provide a remedy for any evils growing out of its enforcement. Addressed to Judges, under such circumstances, it is an invitation or a temptation offered to violate their sacred obligations in order to appease the public.

In Spear's case, 1 Dev., 491, the Supreme Court declared the prisoner entitled to his discharge upon a writ of *habeas corpus*, where the term of the Court expired pending his trial for murder, because he could not be again put in jeopardy for that offence. The defect in the law was subsequently remedied by statute, allowing the Court to continue into the next week if a felony were being tried when the week expired. But the Court, composed of TAYLOR, HALL and HENDERSON, did not hesitate for a moment, because a guilty man might escape. On the contrary, Judge HALL said: " The guilt or innocence of the prisoner is as little the subject of inquiry as the merits of any case can be, when it is brought before this Court on a collateral question of law." Courts enforce laws not simply to punish the guilty, but as well to protect the innocent. The law which fails to provide

for the extradition of a guilty man must be understood and adhered to, because it may be invoked as a protection to the innocent, who are prosecuted without cause, against the annoyance, expense and invasion of personal liberty involved in being extradited. There was error. The prisoners should have been discharged.                                        Error.

CLARK, J. (dissenting): It is a fact agreed in this petition that the defendants being in this State slew the deceased who was over the line in Tennessee. The defendants were indicted in this State for the murder and convicted. On appeal, the conviction was reversed, this Court holding (*State* v. *Hall,* 114 N. C., 909) that there was a defect of jurisdiction because the offence was committed in Tennessee, and that in legal contemplation the parties committing the crime were in Tennessee. If they were in Tennessee, when they committed the crime, they are now in North Carolina, and in legal contemplation are necessarily fugitives from justice. If they were not in Tennessee, but in North Carolina, when they committed the crime, then it was error to hold that the defendants could not be convicted in North Carolina. They should be tried in the jurisdiction in which they were when the offence was perpetrated. That has been held to be in Tennessee. If that is sound law, and the defendants were then, in law, in Tennessee, and now, in fact, are in North Carolina, they are in, legal contemplation and within the language and purport of the extradition law, "fugitives from justice." This term is intended to embrace those who, having committed a crime in one State, endeavor to evade justice by being in another State whither the ordinary process of the State where the crime was committed will not reach them. That is the situation of these defendants. They are sheltering themselves from process by being in another State. They are charged with murder in Tennessee and are now where the ordinary process of the Courts of that State can-

STATE *v.* HALL.

not reach them.   They can only be had for trial in the State of the commission of the crime, by application to the Governor of the State where they are to be found.   They are proper subjects of extradition.

If a mob, occupying the Jersey side of the Hudson, should shell the city of New York, or from the opposite shore of the Delaware should cannonade the city of Philadelphia, its members would be liable to no punishment in New Jersey under the decisions of the Courts because, "in contemplation of law," the mobs are in New York and Pennsylvania.   But if it is true, as is contended by the defendants, that the members of the mob cannot be extradited because the mob never was in those cities, it would be a singular state of things. This ruling would also place Savannah, Memphis, St, Louis, Cincinnati, Louisville and hundreds of other cities and towns at the mercy of any mob which might assemble, with weapons of long range, across the State line.

The preamble to the Constitution of these States recites that it was ordained "to form a more perfect union and insure domestic tranquility."   Article IV., sec. 2, clause 2, provides, "That any person charged in any State with treason, felony or other crime, who shall flee from justice and be found in another State, shall, on demand of the Executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime." It would be a restricted construction, and little calculated to "form a more perfect union and establish domestic tranquility," to hold that a "fugitive from justice," in the purview of this provision, applies only to persons who, being actually, as well as potentially, in the State where the crime was committed, afterwards departed the same.   A person who places himself outside the limits of the State from thence to commit the crime within said State, and ever afterwards avoids going into said State to avoid arrest, as truly "flees from justice" as he who, having committed a crime, flees from the State subsequently.

If an infernal machine sent by mail or express from a distant State explodes and kills the receiver, it is murder committed in the latter State. The sender, skulking in another State to avoid arrest is as truly a fugitive from justice as if he had accompanied the machine to its destination and then fled. The constitutional provision for extradition, and the laws passed in pursuance thereof, it should be remembered, are not criminal, but remedial provisions. They should therefore be liberally construed to effect the purpose intended to be served, which is to extend into another State, through the medium of its Executive, the process of the State whose laws have been violated. This process having no validity beyond its borders can only be made available to arrest the person charged with crime by virtue of the Governor of the State, where such person is to be found, acting under the extradition just as a magistrate of one county may endorse a summons issued by a Justice of the Peace in another county, under *The Code.*

Civilized man must recoil from the practical ruling that the territory adjacent to State boundaries is a "no man's land," and that murder is privileged if committed across a State line. It may be safely said that the Judge who first laid down a ruling, from which such result practically follows, did not foresee the purport and effect of his decision. We are called upon to correct, not to perpetuate, his errors, though others have since followed him. It is true that this restricted construction has been placed on this clause by several Courts and text-writers. But their opinions are merely of "persuasive authority," as we have often held, and entitled only to the weight due to the reasons they give.

Years ago Chancellor Kent (1 Com. 477) said that it would not do "to press too strongly the rule of *stare decisis,* when it is recollected that over one thousand cases in the English and American books have been overruled. Even a series of decisions are not always conclusive, and the revision of a

decision often resolves itself into a mere question of expediency." His remark has received added force since by the fact that overruled cases now number several thousand. Especially a constitutional provision cannot be nullified or rendered of no effect by the erroneous ruling of a Judge. When the choice is presented us, it is his error, and not the Constitution, which must be disregarded. This is clearly so if the Constitution is superior to the power of a Court to amend it by erroneous interpretation.

Courts do not yet claim infallibility and are not above correcting errors, especially in a matter so clearly against the very intent and meaning of the Federal Constitution as a ruling that, though a murder has been committed in the United States, yet a State may be powerless either to try the murderer when found in its borders or to surrender him to another State, where he may be tried.

There is no authority or precedent in this State, and this being with us a case "of novel impression," we are not hampered from giving such construction to the clause as is most consonant to our views of its true intent and purport. It is true the several States might pass statutes broader than the clause quoted from the Federal Constitution, but it is also true that some of them might fail to do so. The Federal Constitution does not contemplate leaving the security of so many cities and towns, lying near State boundaries, dependent upon the inadvertence or unwillingness of the Legislature of a neighboring State to pass an extradition law more liberal than the Federal Constitution. Besides, our statute (Code § 1165) is broader, and authorizes the arrest of "any fugitive" who has committed the crime therein specified " out of the State and within the United States." A fugitive from justice is simply one who, having committed a crime within a State, keeps himself beyond the ordinary process of the Courts of such State. The two cases cited from the Supreme Court of the United States, *Ex parte* Reggel, 114 U. S., 642,

STATE *v.* HALL.

and *Roberts* v. *Reily*, 116 U. S., 80, read according to the spirit instead of the letter, sustain rather than militate against this view. In which case he can be demanded of the executive of any State in which he may be found.

Even if there had been no constitutional provision and no statute, the comity existing between States in a Federal Union would authorize and require the surrender to another State of a person who has committed murder in that State while standing in this State. Should a man on French soil fire and kill a man across the Rhine on German territory, and the French government, while declaring its own courts incompetent to try the slayer, should at the same time refuse, as is here done, to deliver him to Germany to be tried, would not war promptly follow? Yet, certainly, the protection to the criminal should be less and the comity greater, between States in the same Union. This comity between States recognizes corporations chartered in other States. It should certainly recognize that murder is a high offence at common law against a sister State, and we should refuse to shelter the perpetrator when demanded for trial.

In refusing to discharge the prisoner, I think there was no error.

MacRae, J.: I join in the above dissent.